## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| JOSEPH M. MOTT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil No. 8:17 cv 231-PX |
| | ) | Judge Paula Xinis |
| ACCENTURE LLP | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

_____

## FIRST AMENDED COMPLAINT FOR DAMAGES

### Introduction

Plaintiff, Joseph M. Mott ("Mott"), brings this action pursuant to §§ 20-601 *et seq*., § 20-1013(b) of the Maryland State Government Code and §§ 27-6 *et seq*. of the Montgomery County Code to remedy acts of employment discrimination and retaliation by his former employer, Defendant Accenture LLP ("Accenture").  Defendant Accenture and members of its Legal Department purposefully discriminated against Plaintiff: by fostering and maintaining a severe and pervasive hostile working environment intended to constructively discharge him; by repeatedly passing over him for transfers and promotion in favor of less-qualified candidates; by refusing his repeated requests for a transfer out of the hostile work environment to which he was being subjected; and by retaliating against him for reporting the discrimination and hostile work environment.  The unlawful acts by Defendant Accenture culminated in the termination of Plaintiff's employment without cause when the unrelenting pattern of discrimination and retaliation did not succeed in forcing him to resign.

The actions alleged herein were taken against Plaintiff based on his age, national origin and gender, or some combination of all three, and not because of his work performance.  The actions by Accenture and its Legal Department violated the prohibitions against employment discrimination and retaliation set forth in §§ 27-19(a) and (c) of the Montgomery County Code, and Maryland State Government Code Ann. §§ 20-606(a) and (f), as well as Maryland common law.  As a result of Defendant Accenture's actions and conduct, Plaintiff has suffered, and will continue to suffer, damages including lost wages and benefits, loss of future earnings, and compensatory damages.  As a result of the malicious, willful and arbitrary actions by Defendant Accenture as alleged herein, Plaintiff is also entitled to punitive damages.  Accordingly, Plaintiff files this Complaint against the Defendant Accenture and for causes of action states as follows:

**Parties**

1.  Plaintiff is an adult resident of the State of Maryland who resides in Montgomery County.  At all times relevant to this matter, Plaintiff performed his work for Defendant Accenture remotely from his home in Bethesda, Montgomery County, Maryland.

2.  The Defendant, Accenture, LLP, is an Illinois limited liability partnership, qualified to do business in the State of Maryland, and at all time relevant to this matter, was Plaintiff's employer.

**Jurisdiction and Venue**

3.  This Court has jurisdiction pursuant to § 3-403 of the Maryland Courts & Judicial Proceedings Code and § 20-601 *et seq*. of the Maryland State Government Code and § 27-9 of the Montgomery County Code.  Defendant Accenture LLP employs approximately 100,000 individuals throughout the United States and, as such, is an "employer" within the meaning of both Maryland State Government Code § 20-601 and § 27-6 of the Montgomery County Code.

4.   Pursuant to § 20-1202 of the Maryland State Government Code, Plaintiff timely filed an administrative complaint of discrimination with the Montgomery County Office of Human Rights on October 26, 2016 (Case No. E-06316).  The complaint complied in all respects with the requirements of state and county law, specifically §27-7(a) of the Montgomery County Code. The complaint was in writing and sworn under the penalties of perjury.  It alleged the particulars of the discrimination and retaliation alleged herein, identified the name and address of the Defendant and the persons responsible for the discrimination and retaliation and otherwise supplied all additional necessary information.  The complaint was submitted on an EEOC Form 5 (with a detailed attachment).  As required by Maryland State Government Code §20-1202, more than forty-five (45) days elapsed since that filing before the Plaintiff's Complaint was filed in the Circuit Court for Montgomery County.  This action was commenced within two (2) years of the occurrence of the alleged acts of discrimination.

5.   Venue is proper in this Court pursuant to § 20-1013(b) of the Maryland State Government Code and § 6-201(b) of the Maryland Courts & Judicial Proceedings Code because a substantial part of the events giving rise to the claims that are the subject matter of this action occurred in Montgomery County.

**<u>Statement of Facts</u>**

6.   Plaintiff is a 64 year-old (date of birth of July 5, 1953), male of American national origin.  Plaintiff has over 35 years of experience as a lawyer in public service, private law practice and as in-house counsel.  On information and belief, Plaintiff was one of the oldest members, if not the oldest member, of the Accenture Legal Department during the relevant time period.

7.   Plaintiff was hired by Defendant Accenture on December 3, 2014 as a Senior Manager in the Compliance, Offerings, Regulatory and Ethics division ("CORE") of the Defendant

Accenture's Legal Department.  In that role, he was responsible for legal review and analysis of regulatory risk and compliance requirements for Defendant Accenture's U.S. healthcare service offerings to its clients.

8.   In late January or early February 2015 (approximately 8 weeks after the start of Plaintiff's employment), the woman principally responsible for hiring Plaintiff, Louise Arsenault, left Accenture.  Arsenault had interviewed Plaintiff on three separate occasions and recommended his hire.  Arsenault is an approximately 55 year-old female of French-Canadian national origin.  Her job title with Defendant Accenture during the relevant time period was Director of Legal Services, Global Offerings Support, and she was located in Chicago, Illinois.

9.   Plaintiff's second level supervisor was Charlotte Guillorit ("Guillorit").  Guillorit is an approximately 45 year-old female of French national origin.  Guillorit is an attorney, her  title is Senior Director of Legal Services, CORE Offerings Support, and she is located in Paris, France.

10.   At the time Plaintiff was hired, Abe Zachariah ("Zachariah") was designated to be Plaintiff's career counselor.  Zachariah was also the team leader of the four (4) person team to which Plaintiff was assigned.  Zachariah was at the same career level as Plaintiff and is an approximately 50 year-old male of Asian-Indian American national origin.

11.   The other two (2) members of Plaintiff's team were Hollis T. Chen, and Arnaud Mottet.  Chen is an approximately 49 year-old male of Asian-American national origin.  Chen's job title was the same as Plaintiff's - Senior Manager.  Mottet is an approximately 35 year-old male of French national origin.  Mottet's job title was Manager, one career level lower than Plaintiff.

12.   Zachariah and Chen were known to be good friends.  Zachariah also was Chen's career counselor and team leader.  However, Zachariah was very deferential towards Chen and

invariably gave him a performance rating of "exceeded expectations" notwithstanding the actual caliber of his work.

13.    Shortly after Arsenault left Accenture, both Zachariah and Chen began making hostile, derisive, dismissive and demeaning comments to Plaintiff (or to others about Plaintiff), both personally and about Plaintiff's professional background, skills and performance.  Even though Zachariah and Chen were co-equal colleagues with Plaintiff, they began treating Plaintiff in a subservient and demeaning manner.  By way of example, they would repeatedly interrupt Plaintiff while he was speaking in conference calls, and would openly contradict and critique Plaintiff's legal advice to business leaders.  On one occasion in February 2015, while on a team conference call with Zachariah, Chen and Mottet discussing an attorney-client privilege issue, Zachariah raised his voice and said to Plaintiff: "there are a lot of smart f …king people at Accenture, who know a whole lot more than you do;" and Chen added: "we don't care what you have done before you joined Accenture."

14.    By March 2015, Zachariah's and Chen's abusive and disrespectful behavior was so obvious and so persistent that Mottet, the other colleague on the team, apologized to Plaintiff for Zachariah's and Chen's behavior.  Mottet further stated that the lack of collegiality and professionalism exhibited by Zachariah and Chen had resulted in Mottet requesting, and Arsenault and Guillorit approving, Zachariah being removed as Mottet's career counselor and re-assigning Mottet (who is  substantially younger than Plaintiff and of French national origin) to work as a member of a different team with a different team leader.

15.    In addition to Zachariah's and Chen's bullying, hostile and disrespectful behaviors, a third individual also engaged in the pattern of severe and pervasive hostile discriminatory actions and conduct toward Plaintiff.  Fauzia Zaman-Malik, is a Senior Managing Director for Global Healthcare Contracting, and all of Plaintiff's work function revolved around interaction with

Zaman-Malik who was the senior lawyer for all healthcare contracting for Defendant Accenture. Zaman-Malik, whose pattern of disrespectful workplace behaviors was well-known within the Accenture Legal Department, is an approximately 45 year old female of Arab-American national origin.

16.    Zaman-Malik's position as the leader of all healthcare contracting was critical to Plaintiff's success in his healthcare regulatory compliance role.  Zaman-Malik was able to control most healthcare assignments Plaintiff worked on, and could bypass and withhold assignments from Plaintiff arbitrarily.

17.    From the outset of Plaintiff's employment, Zaman-Malik treated him disdainfully and unprofessionally by refusing to have any professional interactions with Plaintiff.  She excluded Plaintiff from discussions, business meetings and activities in Plaintiff's areas of expertise and responsibility; often singled Plaintiff out for criticism during the course of meetings involving more than 50 participants and, by instant messaging, demanded that he immediately leave conference calls because his participation was not required; openly contradicted and critiqued Plaintiff's legal advice to business leaders; and abruptly removed Plaintiff from work assignments by substituting the younger Chen instead without informing Plaintiff.

18.    In April 2015, Plaintiff traveled to London, England for a division-wide training session for lawyers within the CORE team.  Guillorit was in attendance at the meeting, as was Mottet.  But, Zachariah and Chen were not.  Based on reports by Mottet about the treatment Plaintiff was experiencing with Zaman-Malik, Zachariah and Chen, Guillorit inquired about Plaintiff's interactions, expressed concern, but took no action to change the pattern of hostility.

19.    After his return from London, Plaintiff continued to be subjected to the same discriminatory actions and hostile work environment from Zachariah, Chen and Zaman-Malik.

In May, 2015, Plaintiff wrote to Guillorit and requested a transfer to a different assignment within Accenture and asked for her assistance in doing so.

20.     Shortly after receiving Plaintiff's request, Guillorit scheduled a call with Plaintiff in which they discussed the hostile and abusive work environment.  Plaintiff expressed his concern that the environment was non-collegial, adversarial and negatively impacting Plaintiff's ability to succeed in the long-term.  Guillorit acknowledged her awareness of the workplace problems, and responded by informing Plaintiff that she intended to make changes in September, 2015 that would result in: Zachariah's removal from a team leader position; the separation of Zachariah and Chen and their assignment to separate teams; and the appointment of new team leaders that did not include either Zachariah or Chen.  She asked Plaintiff not to transfer until she could accomplish the changes.

21.     Plaintiff agreed to withdraw the transfer request to give Guillorit an opportunity to make the indicated changes.  In the interim, Plaintiff sent Guillorit positive performance reviews from business leaders.  However, the discriminatory and hostile work environment from Zachariah, Chen and Zaman-Malik continued unabated.  At the suggestion of Mottet, Plaintiff continued to participate in weekly 'team calls' but was reticent to discuss issues in order to avoid the pattern of abusive denigration from Zachariah and Chen.

22.     In October, 2015, per job announcement number 00341077, the position of Legal Director, Offerings and Services Regulatory Compliance H&PS Resources became available within the CORE Offerings division in which Plaintiff worked.  Plaintiff applied for, qualified for, but was not selected for the advertised "team leader" position.

23.     Plaintiff's colleague, Chen, also applied for the same position.  Upon learning that Plaintiff had applied for the position, Chen derisively asked Plaintiff "why did you apply for the promotion?  What makes you think you are qualified for the position," implying that the Plaintiff

was too old to be given serious consideration for promotion.  Chen was at the same career level as Plaintiff and had substantially less experience and qualification than did Plaintiff.

24.    From the pool of three candidates, two were chosen to be interviewed and considered for the job.  Plaintiff was not one of them.  Chen was named as a finalist even though Guillorit had advised Plaintiff previously that Chen would not be named a team leader in the reorganization.  Instead, Guillorit, the selecting official, promoted Catherine Walter, a female, who is approximately 40 year-old and who, like Guillorit, is of French national origin.  Walter's experience and qualifications are objectively inferior to Plaintiff's.

25.    Upon realizing that the selection of Walter would not eliminate, and would likely worsen, the severe and pervasive hostile work environment to which he was being subjected, Plaintiff attempted to contact Guillorit several times to discuss the situation and his eight-month partial year performance review written by Zachariah and Chen without his prior knowledge.  Guillorit had led Plaintiff to believe she would conduct the review rather than Zachariah who she had demoted from the position.  However, Guillorit ignored Plaintiff's requests.  Plaintiff thereafter applied for an open position within the litigation department of Accenture for which he was qualified, but he was not selected.  A substantially younger woman (under 40), with background and qualifications inferior to the Plaintiff, was selected.  Plaintiff then applied for another litigation position for which he was well-qualified in the Spring of 2016.  In that instance, a substantially younger Asian-American woman (under 40), with background and qualifications inferior to the Plaintiff, was selected.

26.    From the time of his hire in 2014, and at all relevant times, Plaintiff's performance was satisfactory or better.  Notwithstanding Accenture's written policies, Plaintiff never received a formal performance evaluation during the twenty-two (22) months of his employment.  However, he was verbally notified in December 2015 that he had received a rating of "met

expectations" for the eight (8) month partial year of employment ending August 31, 2015. Zachariah's and Chen's input in arriving at that rating included non-substantive statements such as "[Plaintiff] likes to research."

27.   Plaintiff protested the performance review process and the basis for his rating to Guillorit.  Guillorit ignored three separate requests from Plaintiff to discuss his performance rating before finally scheduling a call with him in mid-January 2016.  In the call Plaintiff asked how his rating was determined, who provided input, and why he had not been involved in any discussion regarding the rating.  Guillorit responded curtly each time with the same phrase: "'we' considered 'everything' carefully."  When queried as to who comprised the "we" and what "everything" meant, Guillorit refused to answer and ended the call.

28.   After Plaintiff protested his performance review, Guillorit's treatment of Plaintiff became overtly more hostile.  She continued to ignore his requests to discuss the hostile work environment.  Consequently, Plaintiff sought the help of a senior lawyer outside of CORE through the Accenture 'mentor program' and continued to apply for other jobs outside CORE Offerings.

29.   Plaintiff had identified a senior managing director in the legal department with whom he previously had limited contact – Michael Camarotta.  However, at the time in question, Plaintiff was unaware that Camarotta was a loyal colleague of Zaman-Malik, one of the sources of the hostile and discriminatory working environment he had complained about.  Plaintiff corresponded with Camarotta in confidence about a mentor relationship, but before even speaking to Plaintiff about the reasons for Plaintiff's request, Camarotta consulted with Zaman-Malik and others.  Thereafter, in his first conversation with Plaintiff, Camarotta expressed the same derogatory and discriminatory views previously exhibited by Zaman-Malik and others.  Camarotta's comments included, among other things, an overt reference to the Plaintiff' age -

"we are both on the back 9's of our careers" - as well as other demeaning remarks suggesting that the Plaintiff's extensive experience should be ignored and he should be treated as an inexperienced, junior staff lawyer.

30.    For the next several weeks, Camarotta purported to assist Plaintiff in finding a new position within Accenture, when in fact he did not.  Over Plaintiff's objection, he insisted that Plaintiff have a conversation with Zaman-Malik.  The call was a one-sided conversation, in which Zaman-Malik initially kept Plaintiff waiting on the call for 15 minutes before she joined, followed by a discourse in which she berated Plaintiff for 45 minutes before abruptly ending the call.  Subsequently, Camarotta effectively ended the Plaintiff's efforts by stating "maybe Accenture isn't the right place for you."

31.    Camarotta also insisted that Plaintiff inform Guillorit that he was seeking to transfer off the CORE Offerings team.  After the disclosure that Plaintiff was actively applying to other positions to escape the hostile work environment, the situation further deteriorated and the retaliation intensified.  Guillorit and Walter continued to ignore Plaintiff's requests for assistance to stop the conduct.

32.    On or around February and March, 2016, Plaintiff learned that Walter had been selected for the team leader position for which Plaintiff had applied.  With Guillorit's knowledge and approval, the substantially younger Walter was overtly hostile to Plaintiff by, among other things, refusing to interact with Plaintiff in a professional manner, actively attempting to undermine Plaintiff's working relationships with other employees and business units, impeding Plaintiff's efforts to move to other positions to avoid the hostility, and falsely and surreptitiously maligning Plaintiff's ability and performance.

33.    Over the five (5) month period after being named Plaintiff's manager, the younger Walter: (i) singled Plaintiff out for removal from assignments after the CORE reorganization

when no one else in CORE Offerings had their job role diminished or radically redefined; (ii) ignored Plaintiff's requests to help stop the hostile work environment; (iii) refused to engage in the Company mandated Performance Achievement activities with respect to Plaintiff including any meaningful discussions (as required by a new employee performance review process) despite repeated requests from Plaintiff to do so; (iv) arbitrarily assigned Plaintiff work priorities and objectives that were menial, demeaning and nonsensical as the primary basis for Plaintiff's annual performance review and ignored Plaintiff's overtures to discuss the assignments; (v) deliberately excluded Plaintiff from discussions and activities in which he had demonstrative expertise and work responsibilities; (vi) openly slandered the Plaintiff as a "loser" and as having "anger issues" when referring to him to others outside of his presence for the purpose of diminishing his role and transferring the regulatory health assignments that plaintiff was handling to herself and Chen; (vii) retaliated against Plaintiff for challenging the discriminatory conduct, including conspiring with Guillorit and others to orchestrate Plaintiff's termination after Plaintiff contacted Human Resources asking to be assigned a different career counselor; and (viii) further retaliated against Plaintiff by feigning that that she was going to participate in a legitimate performance review of Plaintiff's work in the weeks leading up to his termination.

34.    Walter and Guillorit substituted Walter in Plaintiff's job role even though Walter had no experience and limited familiarity with the legal issues involved in U.S. healthcare regulatory matters; as compared to Plaintiff who had decades of prior experience and familiarity in the subject matter.  Walter and Guillorit did not treat any other member of the CORE Offerings team in a similar manner.  Moreover, their treatment of Plaintiff was part of an ongoing pattern of hostility and discrimination toward older employees, and male employees of other than French national origin.  During her four (4) year tenure with Accenture, Walter previously had consorted with Guillorit to orchestrate the involuntary transfer of two of Walter's co-workers, D.S. and

C.W., from the two-person Resources Offering team to which Walter had been assigned by Guillorit prior to her promotion to team leader.  Both of the two co-workers who Walter had involuntarily transferred were of American national origin, while both Guillorit and Walter are of French national origin.

35.   In March 2016, Walter and Guillorit travelled to Chicago, Illinois for a mandatory CORE Offerings team meeting at which the new team leaders were formally introduced.  During the three-day session in Chicago, Plaintiff's new team leader, Walter, met several times privately with Chen and Zaman-Malik.  However, she did not schedule time to meet with Plaintiff for a one-on-one discussion even though there were ample opportunities to do so.

36.   In late June 2016, Walter travelled to Washington, D.C. from Paris, France.  As part of her itinerary, Walter arranged to meet with Chen and Plaintiff to discuss the Performance Achievement process.  Plaintiff made arrangements to procure a private conference room in Accenture's Washington, D.C. office in order to meet with Walter.  But Walter's disparate treatment of Chen and the Plaintiff at that meeting further confirmed her discriminatory animus. On the scheduled day, Walter spent one and one-half hours alone with Chen while the Plaintiff waited in the lobby.  At the end of her meeting with the younger Chen, Walter emerged and announced that it was late and she did not have time to meet with Plaintiff.

37.   Plaintiff thereafter volunteered to meet Walter at her hotel in downtown Washington, D.C. at 8:00 a.m. the next morning before her return to Paris later that day.  Plaintiff arrived at the hotel where Walter was staying well before the scheduled meeting time and emailed Walter that he was in the lobby.  Forty-five minutes later Walter emerged from the hotel restaurant adjoining the lobby, where she bluntly told the Plaintiff that she had eaten breakfast already. Plaintiff persuaded her to return to the restaurant to conduct the meeting, but 10 minutes into the discussion, Walter announced she needed to step outside to have a cigarette.  Plaintiff then

packed up his computer and papers and stood on the public sidewalk for an additional fifteen minutes while Walter chain-smoked cigarettes before announcing that she had to leave.  Walter's unprofessional behavior was part of her ongoing pattern of intentionally making the Plaintiff's working conditions so intolerable that he would be forced to resign.

38.    On June 30, 2016 Plaintiff contacted Beth Phelan, the Human Resources representative assigned to the Accenture Legal Department.  In a call that lasted more than one hour, Plaintiff discussed at length the relentless ongoing pattern of hostile and discriminatory conduct.  Plaintiff requested Human Resources' assistance in removing Walter as Plaintiff's career counselor, and in transferring out of CORE Offerings away from Walter and Guillorit to another position within the Accenture Legal Department at the earliest opportunity.

39.    Plaintiff also sought help from Helen Hickson, a Senior Managing Director in the Legal Department who is the Legal Department Lead for Performance Achievement when it became evident that Walter and Guillorit had no intention of conducting a legitimate Performance Achievement work review with respect to Plaintiff.  Performance Achievement was a new employee performance review system Defendant Accenture implemented in 2015 that required each employee to complete a Gallup Strengths Test and have "meaningful conversations" regarding those results and the employee's background and experience with their career counselor.  Contrary to Accenture written policy, and contrary to the manner in which younger employees were treated, Walter repeatedly refused to engage in the mandated protocol with Plaintiff.  Plaintiff's outreach to Hickson for help was ultimately ignored.

40.    Meanwhile the discriminatory actions and hostile work environment continued unabated.  Examples of such action include, but are not limited to, Chen and Malik-Zaman clandestinely substituting Chen to take over a client project assigned to Plaintiff while Plaintiff was in the midst of completing the work on the project.  Plaintiff was not informed of the change

or otherwise made aware of the change until he later learned that Chen and Zaman-Malik had hired outside counsel to review work previously done by Plaintiff and subsequently made a presentation to senior management on the issues.

41.   Plaintiff also tried unsuccessfully to persuade Chen on several occasions to stop willingly and willfully participating in the pattern of excluding him and secretly criticizing Plaintiff's work product and style to others.  Chen disingenuously responded, among other reasons, that: "he could not control Zaman-Malik's, or Walter's actions and conduct."  When Plaintiff attempted to have substantive discussions about work he shared in common with Chen, Chen condoned and participated in the hostile work environment by repeatedly refusing, and instead offering multiple excuses such as: "he was too busy;" or "he did not have time;" or that matters he was working on were "top secret" and could not be shared with Plaintiff; or "that is just the way things work at Accenture."

42.   After the announcement of Walter's selection as team leader, Walter and Guillorit engaged in deliberate, purposeful and conspiratorial efforts to avoid meeting or speaking with Plaintiff directly during the three-month period prior to terminating his employment on September 14, 2016.  These efforts included, but were not limited to, concealing the alleged "problems with Plaintiff's performance" until the surprise termination discussion between Plaintiff and Guillorit on September 14, 2016.

43.   In late August 2016, Guillorit traveled from Paris to the Washington area for one week on Accenture business.  Guillorit extended a lunch invitation for the three members of her team located in the local area, Zachariah, Chen and the Plaintiff.  However, when Zachariah and Chen were unable to attend, Guillorit cancelled the lunch meeting with Plaintiff and subsequently left town without ever meeting or speaking to Plaintiff.  Guillorit did not meet with Plaintiff at any time prior to the date she notified him of his termination.

44.    Meanwhile, Walter professed to be on vacation with limited availability for the entire

month of August.  This behavior was a continuation of her pattern of failing and refusing to

interact with the Plaintiff on any work-related matters.  Plaintiff did not hear from Walter during

the month of August, either by teleconference or email.  The pattern of hostility continued even

upon her return to work in September 2016.  When more than a week into the month of

September had elapsed, Plaintiff communicated with Walter to inquire about the lack of

interaction and the need to schedule a meeting to conduct Plaintiff's annual performance review.

In response, Walter deceitfully feigned that the meeting would be routine and deliberately

scheduled the meeting for September 14, 2016 knowing that Plaintiff was scheduled to start a

ten-day vacation the following day, September 15, 2016.

45.    In addition to concealing their unlawful intent from Plaintiff, Walter and Guillorit

also deliberately attempted to undermine a favorable performance review that would have

interfered with the pre-textual explanation for the Plaintiff's termination they concocted.  In the

week before the September 14, 2016 termination call, Guillorit contacted and dissuaded another

Managing Director in the Legal Department from writing a positive Performance Achievement

review that the other Managing Director had promised to the Plaintiff in a direct communication.

46.    On September 14, 2016, Plaintiff was scheduled to have a routine performance

review with Walter via a video teleconference call.  However, Walter failed to attend the meeting

and Guillorit participated in her place.  In the call, Guillorit unexpectedly and abruptly informed

Plaintiff that his work performance was being rated as "failed to meet expectations" along with a

recommendation to the Deputy General Counsel in charge of the division, Patrick Rowe, that his

employment be terminated.

47.    Guillorit refused repeated requests to give a reason or justification for the action, and

none existed in writing.  Further, she refused to identify either the sources or content of any input

that led to her decision.  Guillorit also refused to discuss any mention of positive reviews Plaintiff received from business leaders.

48.   Contrary to various written policies of Accenture, Plaintiff had not been given an unsatisfactory evaluation in advance of termination, nor had Plaintiff otherwise been advised in writing or verbally that either: (a) his performance was unacceptable and that, unless improved, he would be terminated; or (b) he was engaged in conduct that, if it continued, would subject him to termination.  In short, directly contrary to Accenture's written policies, Plaintiff was neither advised of any performance shortcomings, nor told what standards he needed to meet in order to preserve his job.

49.   Near the end of the conversation on September 14th, Plaintiff advised Guillorit as follows: "with no rational explanation for this adverse employment action, this action has to be considered a part of the ongoing pattern of discriminatory animus that I have been subjected to as discussed with you previously."  Guillorit responded, "I don't think there has been any discrimination."  Refusing to acknowledge complaints or provide justifications for her actions or non-actions has been a recurring pattern and practice of Guillorit with respect to Plaintiff. Guillorit concluded the call by stating: "I am tired of spending time on this issue."

50.   Plaintiff protested the rating and proposed termination, both verbally and in writing, on various grounds including that the actions were being taken in retaliation for previously reporting and protesting the discriminatory actions and a hostile work environment.  Immediately following Guillorit's phone call informing him of his termination, Plaintiff sent an instant message communication to Beth Phelan, the Accenture Human Resources representative to whom he had spoken three months earlier.

51.   In the September 14, 2016 instant message communication to Phelan, Plaintiff informed her of the adverse employment action that had just occurred stemming from the

ongoing discrimination, hostile work environment and retaliation he had previously reported. After several hours had elapsed and she had not responded, Plaintiff sent Phelan a follow-up e-mail.  In the e-mail Plaintiff again advised Phelan that the ongoing discriminatory acts, hostile work environment and retaliation he informed her about when they spoke on June 30, 2016 had now escalated into a retaliatory adverse employment action.  He asked for help from Phelan and the Human Resources Department.  Plaintiff also copied Accenture's Chief Human Resources Officer, Ellyn Shook, on the email.  Shortly thereafter, Phelan responded by email to Plaintiff stating that she would "get back to him."

52.    Neither Phelan nor Shook ever responded to Plaintiff thereafter.  Instead, Plaintiff was contacted by Toni L. Corban, Accenture Human Resources, Associate Director, North America Employee/Labor Relations, Career Services and Development.  When asked the nature of her involvement, Corban kept repeating her job title.  When Plaintiff queried her knowledge of the elements of an employment discrimination claim, Corban responded that "she is not a lawyer, and is not familiar with the applicable legal standards."

53.    Upon discovering that Corban was unqualified to conduct a timely and thorough investigation, Plaintiff formalized his discrimination and retaliation complaint in a memorandum dated September 27, 2016, which he sent to Chad Jerdee, General Counsel and Chief Compliance Officer for Accenture and Patrick Rowe, Deputy General Counsel for CORE (and Guillorit's direct supervisor).  The September 27, 2016 memorandum clearly alleged an unacceptable culture within the Accenture Legal Department that not only constituted violations of employment discrimination law, but Accenture's Code of Conduct as well.  Moreover, the only relief requested by Plaintiff at that time was to be transferred to another internal position. Yet, Jerdee and Rowe did nothing.  Instead they allowed the "investigation" by Corban to proceed even though Jerdee and Rowe knew, or should have known, that Corban was wholly

unqualified to conduct an investigation that would meet either the applicable standard under the Rules of Professional Conduct governing a corporate legal department, or that would address the violations of the ethics standards set forth in Accenture's Code Of Conduct.

54.     The investigation by Corban was a sham intended only to develop an "after-the-fact" pre-textual basis to justify Plaintiff's termination.  There was no written report or findings produced by Corban and she refused to disclose to the Plaintiff who was interviewed and what the individuals were asked.  Further, she informed Plaintiff of the conclusory results of her investigation orally in a telephone conversation on October 19, 2016, only after Plaintiff pressed her for a status update.  Corban informed Plaintiff that that the reason justifying his termination was "communication deficiencies," a reason never previously cited by any of Plaintiff's managers until Corban announced the oral conclusions of her investigation.  On information and belief, no other Accenture employee at Plaintiff's level has ever been terminated for this reason.

55.     Plaintiff's request for an internal transfer was a particularly reasonable resolution because neither Accenture nor Legal Leadership had done anything to stop the hostile work environment even though the Legal Leadership knew, or should have known, it was occurring and adversely affecting Plaintiff's ability to perform his job duties.  However, Corban falsely told Plaintiff he was eligible for a transfer, and then assigned him a member of her staff to assist in that effort.  The Human Resources staff member subsequently informed Plaintiff that he was only being offered "outplacement" services.  When Plaintiff objected, Corban further retaliated against Plaintiff by berating him for breaching confidentiality because he told the job placement staff member that he had been subjected to discriminatory actions and conduct.

56.     Corban later continued the retaliatory actions against Plaintiff by falsely accusing him of taking a proprietary and confidential item – a copy of Accenture's Medicaid contract with the State of Texas – via an email he forwarded to his personal email account.  Her intent was to

substitute a "for cause" justification for Plaintiff's otherwise inexplicable termination.  Plaintiff immediately responded by informing Corban that: (i) the document in question was a public document he had sent to the Comptroller of Texas in support of successfully arguing that Accenture was exempt from a Texas annual tax; and (ii) the document she falsely accused him of misappropriating was not Accenture's proprietary contract, but rather was a two-page extract from a template located on the Texas Medicaid website that Plaintiff used to support the successful tax exemption argument.  Corban quickly backtracked from her "for cause" allegation and advised Plaintiff that his employment was not being immediately terminated, but his computer access and email account were permanently disabled from that date through his final day of employment on November 20, 2016.

57.    But Corban's retaliation persisted.  Rather than identify any specific document containing truly confidential information, she then claimed that all of the e-mails in Plaintiff's possession, virtually all of which he had sent or received as part of his job, were confidential and proprietary information belonging to Accenture that had to be immediately returned.  Plaintiff informed Corban that he had no intention of disclosing any of the e-mails he had forwarded to himself other than in connection with his claims of discrimination and retaliation, and his counsel made the same point to Accenture's counsel in a letter dated November 16, 2016. Accenture refused the Plaintiff's offer of a voluntary protective order ensuring the e-mails would be preserved, and then escalated the retaliation by threatening the Plaintiff with litigation by letter dated December 12, 2016 from Accenture's outside counsel.

## COUNT I

### (Age Discrimination In Employment In Violation Of
### Md State Gov't Code § 20-1202 & Montgomery County Code §27-19)

58.    Plaintiff hereby repeats and realleges all of the allegations of the preceding paragraphs, as if fully set forth herein.

19

59.     The Defendant Accenture's conduct as alleged herein in creating and maintaining a hostile and abusive work environment, in failing and refusing to permit the Plaintiff to transfer to available positions for which he was qualified, and in terminating the Plaintiff's employment constitutes discrimination based on his age in violation of Montgomery County Code § 27-19.

WHEREFORE, the Plaintiff demands judgment against the Defendant, Accenture LLP, for Accenture, LLP, for back pay, front pay, compensatory and punitive damages, together with interest, costs and reasonable attorneys' fees.

## COUNT II

### (Discrimination In Employment Based On National Origin In Violation Of Md State Gov't Code § 20-1202 & Montgomery County Code §27-19)

60.     Plaintiff hereby repeats and realleges all of the allegations of the preceding paragraphs, as if fully set forth herein.

61.     The Defendant Accenture's conduct as alleged herein in creating and maintaining a hostile and abusive work environment, in failing and refusing to permit the Plaintiff to transfer to available positions for which he was qualified, and in terminating the Plaintiff's employment constitutes discrimination based on national origin in violation of Montgomery County Code §27-19.

WHEREFORE, Plaintiff demands judgment against Defendant, Accenture LLP, for back pay, front pay, compensatory and punitive damages, together with interest, costs and reasonable attorneys' fees.

## COUNT III

### (Gender Discrimination In Employment In Violation Of Md State Gov't Code § 20-1202 & Montgomery County Code §27-19)

62.     Plaintiff hereby repeats and realleges all of the allegations of the preceding paragraphs, as if fully set forth herein.

63.   The Defendant Accenture's conduct as alleged herein in creating and maintaining a hostile and abusive work environment, in failing and refusing to permit the Plaintiff to transfer to available positions for which he was qualified, and in terminating the Plaintiff's employment constitutes gender discrimination in violation of Montgomery County Code §27-19.

WHEREFORE, Plaintiff demands judgment against Defendant, Accenture LLP, for back pay, front pay, compensatory and punitive damages, together with interest, costs and reasonable attorneys' fees.

## COUNT IV

**(Discrimination In Employment Based On Multiple or Mixed Motives In Violation Of Md State Gov't Code § 20-1202 & Montgomery County Code §27-19)**

64.   Plaintiff hereby repeats and realleges all of the allegations of the preceding paragraphs, as if fully set forth herein.

65.   The Defendant Accenture's conduct as alleged herein in creating and maintaining a hostile and abusive work environment, in failing and refusing to permit the Plaintiff to transfer to available positions for which he was qualified, and in terminating the Plaintiff's employment constitutes discrimination based on an unlawful combination of age, gender and/or national origin in violation of Montgomery County Code §27-19.

WHEREFORE, Plaintiff demands judgment against Defendant Accenture LLP, for back pay, front pay, compensatory and punitive damages, together with interest, costs and reasonable attorneys' fees.

## COUNT V

**(Reprisal For Engaging In Protected Activities In Violation Of Md State Gov't Code § 20-1202 & Montgomery County Code §27-19(c)(1))**

66.   Plaintiff hereby repeats and realleges all of the allegations of the preceding paragraphs, as if fully set forth herein.

67.   The Defendant Accenture's conduct as alleged herein in refusing to eliminate a hostile work environment, and in deliberately maintaining that hostile work environment by failing and refusing to permit the Plaintiff to transfer to available positions for which he was qualified, and in terminating the Plaintiff's employment all constitute retaliation against the Plaintiff because he engaged in activities protected by Montgomery County Code §27-19(c)(1).

WHEREFORE, Plaintiff demands judgment against the Defendant, Accenture LLP, for back pay, front pay, compensatory and punitive damages, together with interest, costs and reasonable attorneys' fees.

### COUNT VI
### (Wrongful/Unlawful Discharge In Violation Of Maryland Common Law)

68.   Plaintiff hereby repeats and realleges all of the allegations of the preceding paragraphs, as if fully set forth herein, including but not limited to the factual allegations set forth in paragraphs 53 through 57.

69.   All of the discriminatory acts, practices and conduct by Defendant Accenture were perpetrated by, or under the direction and control of, lawyers within the Accenture Legal Department, including but not limited to Jerdee, Rowe and Guillorit.

70.   The conduct and actions of the lawyers in Accenture's Legal Department, including but not limited to Jerdee, Rowe and Guillorit, are subject to Rule 8.4 of the ABA Rules of Professional Conduct and its counterpart, Rule 19-308.4 of the Maryland Rules of Professional Conduct.  Rule 8.4 of the ABA Rules of Professional Conduct provides that "[i]t is professional misconduct for a lawyer to: … (g) engage in conduct that the lawyer knows, or reasonably should know, is harassment or discrimination on the basis of race, sex, religion, national origin, ethnicity, disability, age, sexual orientation, gender identity, marital status or socioeconomic status in conduct related to the practice of law."  Comment 7 accompanying ABA Rule 8.4 and its Maryland counterpart, Comment 6 to Rule 19-308.4 of the Maryland Rules of Professional

Conduct, state that "[l]awyers holding … positions of private trust such as … officer[s], director[s] or manager[s] of a corporation or other organization … assume legal responsibilities going beyond those of other citizens."  As such, the leadership of the Accenture Legal Department, including but not limited to Jerdee, Rowe and Guillorit, had a heightened obligation and responsibility to investigate and prevent improper discriminatory bias and retaliation within its own ranks in the Accenture Legal Department.

71.   Rule 8.4 of the ABA Rules of Professional Conduct and Rule 19-308.4 of the Maryland Rules of Professional Conduct constitute a clear mandate of public policy under Maryland law.

72.   The Plaintiff's September 27, 2016 memorandum was sent to Jerdee and Rowe, as well as the Chief Human Resources Officer, informing them specifically of the alleged discrimination, hostile work environment and retaliation.  By virtue of their positions, Jerdee, Rowe and Guillorit, each had a heightened legal obligation under both the Maryland Rules of Professional Conduct and the ABA Rules of Professional Conduct to investigate and prevent discriminatory bias and retaliation within the Accenture Legal Department and the personnel under their direction and supervision.

73.   In his September 27 Memorandum, the Plaintiff alleged that "[a] hostile work environment has existed, and discriminatory employment actions have been occurring relentlessly, since shortly after I began my employment with Accenture in mid-December [of 2014]."  The Memorandum alleged the specifics of the hostile work environment, including but not limited to "intentionally excluding [Plaintiff] from business meetings necessary for the performance" of his job and "blocking access to business and legal leaders," and other specific events of abusive workplace treatment.  The Memorandum alleged that he had been subjected to a series of adverse employment actions that "have been improperly motivated by my age, gender

and national origin, or some combination thereof."  And the Memorandum further alleged that the Defendant's refusal to favorably respond to the Plaintiff's repeated requests for a transfer to other positions was part of the pattern and practice of discrimination and also retaliation for his opposition to unlawful practices.  Finally, the Plaintiff alleged in the Memorandum that the decision to terminate his employment (a) was unsupported by any rational explanation, (b) was inconsistent with the Defendant's written performance policies, (c) occurred without prior notice in contravention of established written policies, (d) was contrary to the highly favorable performance input he had received, and (e) was both discriminatory and retaliatory in its motivation.

74.    The leadership of the Accenture Legal Department, including but not limited to Jerdee, Rowe and Guillorit, abdicated, ignored and breached the duty and obligation owed to the Plaintiff under the clear mandate of public policy regarding the investigation, prevention and elimination of discrimination, retaliation and implicit bias being practiced by the Accenture lawyers in this instance by:

(i)    knowingly tolerating and condoning a pattern of discrimination, an ongoing hostile work environment and retaliation;

(ii)    ignoring, failing and refusing to respond appropriately after receiving Plaintiff's September 27, 2016 Memorandum in derogation of the obligations imposed upon them by Rule 8.4 of the ABA Rules of Professional Conduct and Rule 19-308.4 of the Maryland Rules of Professional Conduct;

(iii)    knowingly refusing and failing to conduct or oversee a meaningful, competent and thorough investigation into Plaintiff's claims regarding discrimination and professional ethics violations when Accenture legal leadership knew, or should have known, that the "investigation" was (a) conducted by an individual unqualified to investigate whether Accenture decision makers

24

were influenced by bias or retaliatory motives, and (b) a sham intended to develop a *post hoc* non-discriminatory pre-textual reason solely to obfuscate the discriminatory conduct;

(iv)  knowingly disregarding the conflict of interest posed by conducting an internal investigation into the actions and conduct of its own senior legal managers and directors rather than conducting an investigative process with integrity by engaging the services of an impartial, outside third-party investigator with the requisite legal training and experience in employment discrimination law; and

(v)  on information and belief, knowingly failing and refusing to report the allegations of ethical violations and request for an investigation to Accenture's Board of Directors as required by Accenture's policies and procedures.

75.   The actions by the officers, directors and managers of Accenture's Legal Department in terminating Plaintiff's employment without cause and despite their knowledge of the existence of discriminatory behavior was a violation of the clear mandate of public policy set forth in the applicable Rules of Professional Conduct and was without legal justification or excuse.  As such, the actions of Accenture's Legal Department constituted a wrongful and abusive discharge under Maryland law entitling Plaintiff to recover both compensatory and punitive damages.

76.   WHEREFORE, Plaintiff demands judgment against the Defendant, Accenture LLP, for back pay, front pay, compensatory damages and punitive damages, together with interest, costs and reasonable attorneys' fees.

## COUNT VII

**(Wage Payment & Collection Act Claim In Violation Of
Md Lab. & Employ. Code § 3-507.2)**

77.   Plaintiff hereby repeats and realleges all of the allegations of the preceding paragraphs, as if fully set forth herein.

78.    At the time the Plaintiff was terminated, he had satisfactorily completed all of Defendant Accenture's requirements in order to be entitled to receive an annual bonus which an employer is required to pay to any employee upon termination.

79.    Defendant's fiscal year ended on August 31, 2016 and Plaintiff was employed through and including November 20, 2016.  Plaintiff's bonus for the year ended August 31, 2016 should have been at least equivalent to the bonus he received for the prior year of approximately $12,800 based on a fiscal year end date of August 31.

80.    More than two (2) weeks have elapsed from the date on which the employer is required to have paid the wages, entitling Plaintiff to bring an action against Defendant to recover the unpaid wages.

81.    Defendant withheld the bonus of Plaintiff in violation of this subtitle and not as a result of a bona fide dispute, but for reasons that were not true and instead were a pretext to hide the retaliatory animus.

WHEREFORE, Plaintiff demands judgment against the Defendant, Accenture LLP, in an amount equal to three (3) times the unpaid bonus, together with interest, costs and reasonable attorneys' fees.

## PRAYER FOR RELIEF

Wherefore, Plaintiff requests the Court to award the following damages and grant the following relief:

(a)    Back pay, benefits and other emoluments of employment plus interest.

(b)     Compensatory damages caused by the discrimination and retaliation.

(c)    Front pay at the pay level (including pay increases) until Plaintiff reaches the age of 70 years when he would have otherwise retired but for the discriminatory and retaliatory treatment of him by Defendant Accenture.

(d)    Damages for future pecuniary losses, emotional pain, suffering, inconvenience,

26

mental anguish and other non-pecuniary losses.

     (e)    Punitive damages.

     (f)    Costs and reasonable attorneys' fees incurred in connection with this lawsuit with interest thereon.

     (g)    Such other damages and further relief as deemed just.

## JURY DEMAND

    The Plaintiff requests a trial by jury on the claims asserted in his Complaint.

August 3, 2017                 Respectfully submitted,

                     /s/ Christopher G. Mackaronis
                     Christopher G. Mackaronis, Esq.
                     Stone, Mattheis, Xenopoulos & Brew, PC
                     1025 Jefferson Street, N.W.
                     8th Floor, West Tower
                     Washington, D.C. 20007
                     202-342-0800

                     Robert H. Hillman, Esq.
                     611 Rockville Pike
                     Sandy Spring Bank Financial Center
                     Suite 100
                     Rockville, MD 20852
                     301-804-3400
                     *Counsel for Plaintiff*

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that the foregoing Plaintiff's First Amended Complaint, along with the Complaint for Damages Redlined as Exhibit 1, was filed electronically on August 6, 2017, in accordance with the Court's Electronic Filing Guidelines.  Notice of this filing will be sent to all parties by operation of the Court's Electronic Filing System.  Parties may access this filing through the Court's Filing System.


//ss// Christopher G. Mackaronis
Christopher G. Mackaronis