# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

JOSEPH M. MOTT,           *

     Plaintiff,          *

     v.                *         Civil Action No. 8:17-cv-00231-PX

ACCENTURE, LLP,         *

     Defendant.        *
***

## MEMORANDUM OPINION

Pending in this employment discrimination case is Defendant Accenture, LLP's Motion for Summary Judgment (ECF No. 123), as well as Plaintiff Joseph Mott's Motion to Strike (ECF No. 125) and Cross-Motion for Partial Summary Judgment (ECF No. 124). Also pending are Defendant's Request for Attorney's Fees (ECF No. 115) and Plaintiff's Motion for Reconsideration (ECF No. 116), arising from this Court's August 28, 2018 Order (ECF No. 114). The motions are fully briefed, and no hearing is necessary. *See* Loc. R. 105.6. For the following reasons, Plaintiff's Motion to Strike is GRANTED in part and DENIED in part; Plaintiff's Cross-Motion for Partial Summary Judgment and Motion for Reconsideration are DENIED; and Defendant's Motion for Summary Judgment is GRANTED.

## I.   Background

### A.  Mott's Employment at Accenture

Plaintiff Joseph Mott ("Mott") is an American male, born on July 5, 1953. ECF No. 123-2 at 15. Mott was employed by Defendant Accenture, LLP ("Accenture"), a "global management consulting and professional services firm," as an in-house counsel from December 3, 2014 to November 20, 2016. *Id.* at 6; ECF No. 124-3 at 36. Prior to joining Accenture, Mott had worked as an attorney for over thirty-five years, including a decade of practice in the health

care regulatory field.  ECF No. 124-3 at 44.

In 2014, Mott applied to Accenture for the position of Senior Manager in the Global Offerings Support ("Offerings") team within the Compliance, Offerings, Regulatory and Ethics ("CORE") division of the firm's Legal Department.  ECF No. 123-2 at 6; ECF No. 123-3 at 5–6. Mott was interviewed by multiple members of the Offerings team, including Charlotte Guillorit, Hollis Chen, Abe Zacharia, and Louise Arsenault.  ECF No. 123-3 at 5.  Charlotte Guillorit, a French female born on August 29, 1972, the head of the Offerings team who retained ultimate staffing authority, hired Mott.  ECF No. 123-2 at 170, 182, 186.

When Mott first worked for Accenture, he reported directly to Abe Zacharia, an American male born on November 19, 1960, who managed the Health and Life Sciences team within Offerings.  ECF No. 123-3 at 43 (Zacharia Decl.).  Zacharia, in turn, reported to Guillorit. *Id.*  Zacharia's team included (1) Mott; (2) Hollis Chen, an American male born on March 27, 1966; and (3) Arnaud Mottet, a French male born on May 12, 1977.  ECF No. 123-2 at 6 (Chen Decl.); ECF No. 123-3 at 56 (Mottet Dep.).  For the duration of Mott's employment, he worked remotely from Maryland.

## B.  Facts Related to Mott's Hostile Work Environment Claim

Mott contends that a "hostile work environment began almost immediately" after he joined Accenture.  ECF No. 124-3 at 44.  In March 2015, Mott traveled to London for training where he met his team member, Arnaud Mottet, in person for the first time.  ECF No. 123-2 at 61.  Mott discussed with Mottet "the abusive conduct that Zacharia and Chen were engaging in every time [the team was] on a phone conversation."  *Id.*  With regard to Fauzia Malik-Zaman,[1] who was head of the Complex contracting group and to whom Mott occasionally provided

---

[1] Malik-Zaman is an American female born on June 12, 1972.  ECF No. 123-3 at 109.

regulatory advice, Mott also raised "that [he] was being excluded" from phone meetings conducted by Malik-Zaman. *Id.*

In May 2015, Zacharia authored Mott's mid-year performance review. ECF No. 123-3 at 44. Mott received the rating of "Met Expectations" for nine of the eleven enumerated categories and "Exceeded Expectations" rating in the remaining two areas identified as "Business Operator Results" and "Develops self and others." *Id.* at 49. Among Mott's strengths, Zacharia noted Mott's experience and knowledge in the health-care industry and added that "Mott enjoys legal research and is able to research many topics without outside counsel assistance." *Id.* at 51.

However, this review, which covered Mott's first six months at Accenture, also identified deficiencies in Mott's performance. Under "Areas for development," Zacharia noted:

> 1. When asked questions, Joe should focus the answers on what the person is asking and the reason they are asking the question. There has been a tendency not to really hear the concern or question and to go on tangents, and that then necessitates multiple repetitions of the same question. Answer the question before discussing tangential matters. Make an effort to pause in a conversation and give the other person a chance to express their question(s) and for you to hear what they don't understand. Work on brevity when writing emails and answering questions. Try to get to the point quickly and avoid using abbreviations or acronyms without first defining them. Keep in mind that if it can't be read on one smartphone screen, it may not get read.

> 2. Stay flexible in analyses and approach. Accenture is a large company with many internal capabilities, practices, and policies. There are often several ways to approach compliance or legal requirements. Accenture may not do things in the same way that former employers or others do things but that does not mean Accenture must change the way it approaches compliance or legal requirements. Accenture can have a valid approach that differs from others for many different reasons, from the size of the organization, to cost, to history of the development of the practices and policies, etc. To avoid causing Accenture folks unnecessary concern, if you think Accenture must approach something differently, first discuss with Abe or Hollis. As Joe learns about Accenture, its resources, and how it operates, I expect this should no longer be an issue.

ECF No. 123-3 at 51, 93–94.

Mott next received his annual review in November or December of 2015, which largely

echoed his mid-year review. Zacharia recommended a "Consistent With Peer Group" rating and reiterated that Mott could "work on being briefer in his emails and answers to questions, and be more focused on answering the questions asked of him before digressing to related topics and information." *Id.* at 51.

Zacharia was not alone in identifying difficulties with Mott's communication style. Mott's teammate, Chen, "found Mott hard to work with because he had trouble focusing. Mott would identify issues and then digress off topic." ECF NO. 123-2 at 7. Zaman-Malik similarly "found it very difficult to keep Mott focused on calls as he quickly would move from one topic to another." ECF No. 123-3 at 110. Zaman-Malik added that "Mott's advice was not concise, he would go off on tangents, he was long-winded and he would provide no clear or direct answer to questions raised." *Id.*

### C. Mott Requests a Transfer

Mott continued to confide in Mottet regarding the difficulties he was having with the team. On May 5, 2015, Mott wrote a lengthy email to Mottet recounting a series of events within his team in which he also mentions that he may "have to ask [Guillorit] about a transfer" within the Legal Department. ECF No. 123-3 at 65. Mott's email centered on his conflicts with Zacharia, Chen, and Fauzia Malik-Zaman. Mott noted in particular a conference call where Malik-Zaman, evidently frustrated with Mott, asked Mott to drop the call. *Id.* at 66. Mott described to Mottet that Chen was "uber OCD" and that he (Mott) had "rebuke[d]" and "chastise[d]" Chen for certain behavior. *Id.* at 65–66. Mott concluded that Zacharia and Chen's "collective inability to recognize their managerial and collegial shortcomings makes it increasingly obvious that this won't work for me." *Id.* at 67.

On May 10, 2015, Mottet informed Mott that Mottet had "an informal discussion with

[Guillorit]" regarding "the integration problem that exists" on Mott's team. ECF No. 124-3 at 157. Mottet wrote that Mott was "facing the same problem I faced with Hollis [Chen] 3 years ago" and encouraged Mott to share with Guillorit his "feelings about . . . [his] lack of integration." *Id.*

On June 2, 2015, Mott sent Guillorit an email asking for her "approval and support regarding a potential transfer to a different position." ECF No. 124-3 at 160. Mott took issue with his mid-year performance review from Zacharia and provided several "example[s] illustrating the challenge[s]" he was having. *Id.* Guillorit responded that she would "like to set up some time" to have a "follow on discussion as we may have other position [sic] in the Offering team." *Id.* at 159. Guillorit added that "everyone in Legal is absolutely free to apply to any existing open position . . . even if I think it would be a much better fit to stay in Offerings." *Id.* Mott replied, "one of my many flaws is an unfailing sense of loyalty (no matter how misguided) . . . so of course I will continue to work for you in Offerings." *Id.*

Mott's apparent frustration with his team continued after his exchange with Guillorit. In September 2015, Mott sent another email to Mottet, detailing his recent falling out with Zacharia and Chen. ECF No. 123-3 at 71. Mott concluded, and shared with Mottet, "the ineptitude" of his colleagues, and that he (Mott) had "far greater legal and management skills than both [Zacharia and Chen] combined." *Id.* Mott further characterized his interaction with his colleagues as a "farce" which "exemplifies the poor management training and management selection process within ACN." *Id.*

### D. Mott Applies for Other Positions with Accenture

In October 2015, Mott applied to transfer to Accenture's litigation department. ECF No. 123-3 at 136; ECF No. 123-4 at 2–9. The announced "Preferred Qualification" for this position

was prior experience as a "[p]artner at [a] law firm." ECF No. 123-4 at 7. The posting also stated that, "Employees are expected to be in their current position for a minimum of 12 months before applying to a new position." *Id.* Over 300 candidates applied for the position, and Mott was not selected for an interview. *Id.* at 12; ECF No. 123-3 at 158. Accenture ultimately hired a female candidate "from an external law firm with relevant and recent litigation experience" to fill the position. ECF No. 123-3 at 154.

In the fall of 2015, Mott also applied for a Team Lead position within Offerings. ECF No. 123-2 at 37; ECF No. 123-4 at 27. As part of reorganizing the department, Guillorit announced a position for Legal Director, Offerings and Services, Regulatory Compliance, H&PS Resources. ECF No. 123-4 at 15. The position required knowledge and experience related to three enumerated subjects: (1) healthcare regulatory; (2) public service; and (3) resources. ECF No. 123-3 at 151–52. Both Chen and Mott applied for the position, among others. ECF No. 123-4 at 25. Guillorit interviewed Mott for the position on November 17, 2015. ECF No. 123-4 at 33. In her contemporaneous notes, Guillorit documented that Mott still needed "to learn about Accenture organisation [sic], processes, methodology and approaches," and that he was "[too] focused on the scope of the existing role rather than the scope of his new role." *Id.* at 34. Guillorit also noted that Mott had a "[h]ard time . . . listen[ing] and responding to questions" and determined Mott was "not ready to take on this role." *Id.* at 34–35. Guillorit instead selected Catherine Walter[2] for the Team Lead role. ECF No. 123-3 at 153.

Mott applied for a second litigation position in April 2016. *See* ECF No. 123-3 at 139–46. "Partner at [a] law firm," as with the prior litigation attorney posting, was listed as a preferred qualification and the position's primary location was listed as Chicago. *Id.* at 139, 143.

---

[2] Walter is a French female born on March 22, 1971. ECF No. 123-4 at 44.

Over 100 candidates applied, and Accenture hired an external candidate who was a female attorney at a law firm. *Id.* at 157, 163–64.

### E. Mott's Interaction with Michael Cammarota

In apparent recognition that his employment at Accenture was off to a rocky start, Mott sought the assistance of Michael Cammarota, an attorney in the Legal Department senior to Guillorit. ECF No. 123-2 at 94 (Mott Dep.) ("[G]iven the dynamic . . . I needed to seek help from somebody higher in the food chain."). *Id.* During their first phone call in January 2016, Cammarota, in Mott's characterization, made ageist comments. *Id.* at 94–99. Mott more particularly recalls Cammarota asking Mott, "what are you doing here" and commenting that Mott did not "appear to want to be general counsel." *Id* at 94. Mott also recalls Cammarota, who is "well into his 50s," commenting that they were "both on the back nines of our career." *Id.* at 94, 95.

### F. Offerings Team Reorganization

In the spring of 2016, Accenture restructured the Offerings team, reconfiguring the previous six teams under Guillorit's supervision into five teams. *See* ECF No. 123-3 at 3; ECF No. 123-4 at 41. Of the five Team Leads Guillorit selected, three were men, three were Americans, all were over the age of forty, and two were over the age of fifty. ECF No. 132-2 at 221. Mott's Health team was dissolved and absorbed into the newly named Health & Public Services, Resources, and Regulatory Compliance team. ECF No. 123-4 at 41; ECF No. 123-2 at 232. Walter, as the Team Lead of Health & Public Services, Resources, now supervised Mott and Chen. Mott's previous supervisor, Zacharia, no longer belonged to the team. ECF No. 123-4 at 42.

Zacharia had also been Mott's Career Counselor within the organization. Before the new

teams were finalized, Mott had repeatedly asked Guillorit by email in late 2015 and early 2016 to provide him a Career Counselor other than Zacharia. ECF No. 123-4 at 37–38. On March 23, 2016, Guillorit informed Mott that she was "finalizing the org chart," and would assign him a new Counselor in the coming weeks. *Id.* at 37. Guillorit also told Mott that his "role . . . can evolve in terms of area of expertise." *Id.* On March 25, 2016, Walter confirmed with Mott that she would serve as his new Career Counselor in addition to her role as Team Lead. *Id.* at 49.

As part of the reorganization, Walter proposed that Mott assume responsibility for the newly defined area of "Defense & Public Safety and Regulatory Compliance." *See* ECF No. 123-4 at 42. Walter testified that because Mott had expressed his dissatisfaction with the dynamic on the Health team, she believed Mott "was in a good position to start something new." *Id.* at 68. However, shortly after Mott agreed to this new assignment, Walter encountered difficulty in getting Mott to complete tasks. Mott, for example, refused to take the steps necessary to formalize Walter's role as his Career Counselor, despite having asked Guillorit for her to assign him a new Career Counselor. Accenture's online system requires the counselee to designate a new Career Counselor. ECF No. 123-4 at 66. Mott delayed making the change in the system because he "had reservations about whether the current assignment (or more aptly the changing assignment is a good fit for me." *Id.* at 128. As a result, Walter could not access Mott's performance reviews. *Id.* at 67.

By April 2016, Guillorit and Walter grew "concern[ed] about Mr. Mott's willingness and/or ability to implement changes." ECF No. 123-2 at 207. They sought advice from Beth Phelan, Human Resources lead, regarding potential next steps. *Id.* This consultation was based in part on Mott's now questioning the very changes in his career counselor and job duties to which he had previously agreed. *Id.* at 207–08.

By early June 2016, Guillorit requested that Phelan provide severance accrual figures for Mott in the event that Accenture terminated him.  ECF No. 123-2 at 189.  Guillorit acknowledged that "given the lack of progresses and/or inability to make things – changes with Joe" that his termination was a possibility.  *Id.* at 190.  "Things were not progressing at all.  So yeah, I was concerned about [terminating Mott] while continuing to try to improve things."  *Id.* at 190.

Mott separately asked Phelan for guidance on June 30, 2016.  During his hour-long call with Phelan, Mott recalls raising "the subject [of discrimination] . . . and discuss[ing]" the topic "extensively."  ECF No. 123-2 at 105.  Phelan's contemporaneous notes of this conversation make no mention of discussing Mott's concerns regarding discrimination.  ECF No. 123-4 at 170.  Nor does the record reflect that Phelan shared Mott's concerns with anyone else.

Mott continued to resist changes arising from the department reorganization, including the new collaborative priorities process.  As part of the corporate restructuring, Accenture rolled out its new "Performance Achievement" program, a "collaborative process" where Career Counselors and counselees together were to define job objectives and priorities.  ECF No. 123-4 at 64–65.  While other employees generally completed the drafting and uploading of their priorities in about an hour and a half, Mott's process stretched over several months.  ECF No. 123-2 at 211.

In particular, Walter's "many discussions" with Mott about defining employment priorities resulted in Mott uploading only two priorities into the online system that, unbeknownst to Walter, "had nothing to do with what [they] had discussed."  ECF No. 123-4 at 65.  When Walter learned of the uploaded priorities, she told Mott that because they were "completely different from the ones that we discussed," Mott should also upload the previously agreed-upon

priorities. *Id.* at 136. Mott refused, and instead became increasingly hostile and disrespectful

toward Walter. On July 6, 2016, Mott writes, "I have great difficulty with our interaction, and

frankly I am exasperated." *Id.* at 135. He continues,

> I don't know why this item is a priority since you recently advised me that you believe
> my colleague Hollis has more regulatory expertise than I do (which of course, is
> categorically incorrect and indicative of the core problem – i.e. you have little familiarity
> with my background and experience and you have shown no inclination toward wanting
> to rectify that shortcoming).

ECF No. 123-4 at 137. Mott describes Walter's suggestions as "suffer[ing] from a myopic

approach." *Id.* at 138. Mott criticized Walter's guidance, saying, "even the manner in which

you have dictated that I approach the issue denotes a lack of professional regard that is affronting

. . . ." *Id.* Mott further conveyed his reluctance to work with Walter going forward:

> As I told you in my last email on this subject, I was willing to try to make the career
> counselor relationship work with you. However, your subsequent actions, words and the
> tenor of our exchanges clearly indicates that our situation is not working. I am not sure
> what it is that we could discuss at this point to alter the dynamic . . . .

*Id.* at 136.

The same day, Walter forwarded this correspondence to Guillorit who, in turn, forwarded

it to Phelan, noting,

> The situation is just becoming worse as you can see below. . . . Each time it seems to be
> better (which was the case when Catherine was in Washington), it appears afterwards that
> he is still doing only what he wants to do and coming back on topics previously
> discussed. No one else in this team, at this SM level (even M level), requires so much
> time for explanations, discussions coaching . . . . Catherine is starting to have hard time
> talking to him given the way he is interpreting what has been discussed and coming back
> always on same things.

ECF No. 123-4 at 145.

Five days later, on July 13, Walter sent Phelan a summary of her ongoing difficult

interactions with Mott. *Id.* at 151–53. In the summary, Walter chronicled the difficulties she

experienced with keeping Mott on task regarding his priorities, his increasing insistence that

Walter not act as his career counselor, and his repeated discussions about his "difficult relationship with his colleague Hollis," his "unmerited 'bad' rating (3) since he has joined Accenture," and "his experience prior to joining Accenture," among other related topics. *Id.* at 152. "When Joe starts talking about these topics (i.e. absolutely every discussion), it becomes impossible to stop him and one is in front of a never ending monologue." *Id.*

### G. Mott's Termination and Discrimination Complaint

By the end of July or early August, Guillorit had decided to terminate Mott. ECF No. 123-2 at 175. Prior to making this decision, Guillorit had sought and received input from Zacharia, Zaman-Malik, and Walter. Guillorit also alerted her supervisor, Deputy General Counsel for CORE, Patrick Rowe, who did not object to her decision. *Id.* at 186–87. After returning from paid leave in August 2016, Guillorit scheduled a Skype meeting with Mott "in view of upcoming Talent discussions." ECF No. 123-4 at 184. The call occurred on September 14, 2016, during which Guillorit told Mott he was fired. ECF No. 123-2 at 219. As grounds for termination, Guillorit cited Mott's "communication skills," "resistance to changes," and "unacceptable email[s] sent to his supervisor." ECF No. 123-2 at 171 (Rule 30(b)(6) dep.)). According to Guillorit, Mott raised the subject of discrimination with Guillorit "for the first time" on the call. *Id.* at 219.

Immediately after his termination, Mott sent an instant message to Beth Phelan that he would "now need to formalize my employment discrimination complaint and retaliation that I discussed with you earlier." ECF No. 124-3 at 236. Mott followed his message with an email to Phelan later that day, reiterating his wish to formalize his discrimination complaint. *Id.* at 238. Mott's allegations prompted an investigation within Accenture, led by Toni Corban, Accenture's North America Employee Relations Director. ECF No.123-4 at 44. On or about September 26,

2016, Mott drafted a memorandum for Toni Corban and other members of the Legal Department detailing his discrimination complaint. ECF No. 124-3 at 53–55. The investigation concluded with a finding that no discrimination or retaliation occurred. ECF No. 123-3 at 149.

About a year after Mott's departure, Mott's position was filled by Victor Gonzalez, a 54-year old American male. ECF No. 123-4 at 200. Chen also assumed certain of Mott's responsibilities. *Id.* at 90.

### H. Procedural Background

Mott originally filed this action against Accenture in December 2016 in the Circuit Court for Montgomery County, alleging seven counts, including employment discrimination claims under the Montgomery County Code and the Maryland State Government Code and an unpaid wages claim under the Maryland Wage Payment and Collection Law ("MWPCL"). *See* ECF No. 2. Accenture removed the action to this Court on January 25, 2017, citing the Court's diversity jurisdiction. ECF No. 1 at 1. Thereafter, this Court dismissed Count VI of the Amended Complaint for wrongful discharge in violation of Maryland common law. *See* ECF No. 40. Discovery ensued on the six remaining counts, culminating in the parties' cross motions for summary judgment and Mott's motion to strike certain evidence from the Court's consideration. The Court first addresses Mott's motion to strike.

### II. Motion to Strike

At the summary judgment stage, the Court must consider only such record evidence as would be admissible at trial. Fed. R. Civ. P. 56(c)(2). The Court may not consider any evidence of which the nonmoving party successfully challenges admissibility. Fed. R. Civ. P. 56(e); *see also Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996). Mott has lodged an array of challenges to Accenture's record evidence. The Court considers each in turn.

### A. Evidence Relating to Mott's Substantive Legal Advice

Mott first moves the Court to strike "[a]ny aspects of Accenture's defense in this case (including argument, evidence or testimony) alleging that the decision to terminate the Plaintiff was in any way related to, or based upon, his provision of legal services, consistent with the Court's order on May 10, 2018 (ECF No. 89)." ECF No. 125 at 1. While broadly phrased, Mott's motion arises from the parties' discovery dispute regarding Accenture's assertion of attorney work product privilege over certain portions of emails in which Mott provided legal advice relating to Accenture's clients. *See* ECF Nos. 65, 66.

In connection with resolving this discovery dispute, Accenture confirmed that it did not intend to argue that Mott was terminated because he provided substandard "substantive legal advice;" rather, Accenture would contend that Mott was terminated for his lack of interpersonal skills and his abrasive "communication style." ECF No. 129-1 at 6. Because the quality of Mott's legal advice, according to Accenture, was not at issue, the Court permitted Accenture's select redactions. ECF No. 89 at 1. In so doing, the Court specifically noted "that Accenture's defense regarding the grounds for Plaintiff's termination does not involve the quality of Plaintiff's substantive legal advice during the course of his employment." *Id.*

Mott contends that Accenture now fronts Mott's "provision of legal advice" as one ground for his termination. ECF No. 125-1 at 4. Mott particularly points to Zaman-Malik's declaration that Mott had provided "conflicting or ambiguous legal advice," and that he "was not concise, he would go off on tangents, he was long winded." *Id.* at 3 (citing Zaman-Malik's Decl.). Accenture counters that the evidence is offered to illustrate one of Accenture's stated reasons for terminating Mott, his difficult communication style.

The Court rejects Mott's broad characterization that all such proffered evidence goes to

the substantive "provision of legal advice," and thus must be stricken. Rather, to the extent Accenture offers evidence that implicates the *quality of Mott's substantive legal advice*, it will be stricken from consideration. *See, e.g.*, ECF No. 123-3 at 110 (Zaman-Malik Decl.) ("Mott would provide unrelated, conflicting or ambiguous legal advice."). By contrast, evidence that Accenture terminated Mott, in part, for his poor communication style, without implicating the substance of his legal advice, is properly before the Court. *See, e.g.*, ECF No. 124-3 at 96 (Guillorit Dep.) (discussing Mott's "unability [sic] to be concise and crisp in his communication").

### B. Chen, Zacharia, and Zaman-Malik Declarations

Mott next argues that the Court must strike portions of the declarations submitted by Chen, Zaman-Malik, and Zacharia as "inconsistent with the testimony of Accenture's 30(b)(6) witness." ECF NO. 125 at 1. Mott contends that the witness affidavits "have been included as an attempt to ambush Plaintiff with certain allegations not made by Accenture's Rule 30(b)(6) witness," Guillorit. *Id.* at 5.

Federal Rule of Civil Procedure 30(b)(6) requires that persons designated "testify about information known or reasonably available to the organization." The Rules craft a mechanism by which the corporation may designate individuals who speak on the corporation's behalf. Accordingly, "[t]he testimony elicited at the Rule 30(b)(6) deposition represents the knowledge of the corporation, not of the individual deponents." *Weintraub v. Bd. of Cty. Comm'rs for St. Mary's Cty.*, No. DKC 2008-2669, 2009 WL 2366140, at *3 (D. Md. July 28, 2009). The corporation must, therefore, prepare its designees "to give knowledgeable, and binding answers for the corporation." *Id.* at *2 (citation omitted). This obligation "extends only to the topics in the Rule 30(b)(6) notice of deposition," and "the organization cannot be penalized if the

deponent does not know the answer" to questions outside the scope of the notice. *E.E.O.C. v. Freeman*, 288 F.R.D. 92, 99 (D. Md. 2012).

Mott avers that "Accenture did not adequately prepare Guillorit" to "competently testify . . . on behalf of the corporation." ECF NO. 125-1 at 6. Mott specifically cites to four of the five topics on which Guillorit was designated to testify, including:

> each and every "reason or justification relied upon" for the Plaintiff's termination (Topic 1), the identification of each person who had input into the termination decision along with the "*substance, date and nature*" of the input (Topic 2), "*[e]ach occasion*" in which the Plaintiff was informed "that his job performance was deficient and/or that he could be subject to termination because of his job performance" and "*the substance and date* of any such communications" (Topic 3), and "*[e]ach occasion*" in which the Plaintiff was "disciplined or warned about his job performance" (Topic 4).

*Id.* at 2 (emphasis added by Plaintiff); *see also* ECF NO. 124-3 at 290.

As to the first topic, Guillorit testified to three reasons for terminating Mott, including his poor communication skills. When pressed during the deposition for "specific examples" of Mott's deficiencies, Guillorit's responses were, in Mott's view, inadequate, thus requiring that the evidence be stricken. ECF No. 125-1 at 6. The Court disagrees.

First, Mott designated as the topic every "reason or justification relied upon" by Accenture for terminating Mott. Guillorit provided three such reasons. Then, when pressed for "every example" on which Accenture relies to support its justification that Mott had "communication skill problems," Guillorit responds:

> So, in fact, there is a [sic] numerous examples of that, some have been noticed by other than me, but he is – you know, in terms of feedback provided to him, it was around, you know his unability [sic] to be concise and crisp in his communication. It was about providing very academical legal advice. It was about difficulties to come to solutions while focusing always on problems, and commenting again and again on the same things.
>
> It was about – again, you know, during calls or discussions, where we were supposed to discuss certain of our topics, it was about coming back always on the

15

same topic around his background, his previous experiences which, you know, prevents us during those discussions to be able to address the point where we were supposed to address, and it happened several times.

ECF No. 123-2 at 171–72.

When further pressed for "precise" dates and times, Guillorit could not recall a specific date, but she did testify that Mott's challenges persisted over months "where we've seen no improvement at all in terms of the feedback that has been provided to Mr. Mott before, and we've seen, you know, the situation becoming worse." *Id.* at 177. Guillorit also named the other employees who interacted with Mott and who could provide personal knowledge of his chronically poor communication skills. Thus, the Court finds that Guillorit was adequately prepared to share knowledge pertinent to the designated topics. The Court finds no basis to strike the 30(b)(6) testimony. *See Wilson v. Lakner*, 228 F.R.D. 524, 528–29 (D. Md. 2005).

Mott further asserts that because Chen, Zacharia, and Zaman-Malik provide more specific information about Mott's lack of adequate communication skills, this evidence is "inconsistent" with Guillorit's 30(b)(6) testimony and thus should be stricken as "new or different allegations that could have been made at the time of the 30(b)(6) depositions." ECF No. 125-1 at 7 (citing *Rainey v. American Forest & Paper Ass'n*, 26 F. Supp. 2d 82, 94 (D.D.C. 1998)). The Court, once again, disagrees.

The declarations simply amplify the 30(b)(6) testimony that Mott was not concise in his communications. *See e.g.*, ECF No. 123-3 at 110 (Zaman-Malik Decl.) ("In my opinion, Mott's advice was not concise, he would go off on tangents."); ECF No. 123-2 at 7 (Chen Decl.) ("Mott would identify issues and then digress off topic."); ECF No. 123-3 at 44 (Zacharia Decl.) ("I had many conversations with Mott about being briefer and more focused and concise in answering questions."). Even with the most favorable of gloss for Mott, the Court cannot find that these

witnesses effectively raise new or different reasons for his termination beyond those attested during the 30(b)(6) deposition. The Court, therefore, denies Mott's motion to strike portions of these affidavits.

### C. Corban Declaration

Finally, Mott moves to strike the "declaration of Toni Corban dated October 11, 2018, because her affidavit is without foundation, contradicted by Accenture admissions, and otherwise inconsistent with the requirements of Fed. R. Civ. P. 56(c)." ECF No. 125 at 1. Specifically, Mott challenges paragraph two of Corban's declaration that states, "Joseph Mott's talent outcome for the 2015-2016 performance review cycle was 'Not Progressing/Improve Performance.'" *See* ECF No. 123-4 at 44 (Corban Decl.). Mott argues that Corban lacks the requisite personal knowledge to make such a claim. ECF No. 125-1 at 8.

Federal Rule of Civil Procedure 56(c)(4) provides that an "affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Accordingly, "a court may strike portions of affidavits that lack personal knowledge, contain hearsay, or rest upon conclusory statements." *Contracts Materials Processing, Inc. v. Kataleuna GmbH Catalysts*, 164 F. Supp. 2d 520, 527 (D. Md. 2001) (citing *Evans*, 80 F.3d at 962).

Accenture has not demonstrated Corban's personal knowledge of Mott's talent outcome. Corban investigated Mott's discrimination claim on behalf of Accenture. No evidence exists that Corban possessed any personal knowledge of Mott's performance. Further, Accenture's proffered foundation for Corban's affidavit, her interview with Guillorit "concerning Mott's alleged wrongful termination" is hearsay, and thus inadmissible at trial. The Court cannot fairly

consider such evidence at the summary judgment stage.  The motion to strike paragraph two of the Corban Declaration is granted.

### III.    Motion and Cross-Motion for Summary Judgment

Accenture moves for summary judgment on each of Mott's remaining claims.  *See* ECF No. 123.  Mott cross-moves for partial summary judgment on Count VII under the Maryland Wage Payment and Collection Law.  *See* ECF No. 124.

#### A.  Standard of Review

Summary judgment is appropriate when the Court, viewing the evidence in the light most favorable to the non-moving party, finds no genuine disputed issue of material fact, entitling the movant to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008).  "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'"  *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)).  "A mere scintilla of proof . . . will not suffice to prevent summary judgment."  *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003).  Importantly, "a court should not grant summary judgment 'unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances.'"  *Campbell v. Hewitt, Coleman & Assocs., Inc.*, 21 F.3d 52, 55 (4th Cir. 1994) (quoting *Phoenix Sav. & Loan, Inc. v. Aetna Casualty & Sur. Co.*, 381 F.2d 245, 249 (4th Cir. 1967)).  Where the party bearing the burden of proving a claim or defense "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at

trial," summary judgment against that party is likewise warranted. *Celotex*, 477 U.S. at 322.

Employing this standard, the Court addresses the propriety of summary judgment as to each claim of discrimination.

### B. Discriminatory Discharge

Mott brings his claims of age, national origin, and/or gender discrimination under Montgomery County Code § 27-19, to which a private right of action is provided by Md. Code, State Gov't 20-1202. Maryland courts consider such discrimination claims under the Title VII framework.[3] *Idris v. Ratner Co./Creative Hairdressers*, No. TDC-14-1425, 2014 WL 5382633, at *3 (D. Md. Oct. 21, 2014) (citing *Haas v. Lockheed Martin Corp.*, 396 Md. 469, 504 (2007)). In Title VII discrimination cases, "the plaintiff bears 'the ultimate burden of persuading the court that [he] has been the victim of intentional discrimination.'" *DeJarnette v. Corning Inc.*, 133 F.3d 293, 297 (4th Cir. 1998) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).

A plaintiff may survive summary judgment by establishing his discrimination claim either through direct and indirect evidence of discriminatory animus, or through the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 318 (4th Cir. 2005). Under either avenue of proof, the focus is "on whether a reasonable juror could conclude that illegal discrimination was a motivating factor in the employment decision." *Sawicki v. Morgan State Univ.*, No. WMN-03-

---

[3] As courts in this Circuit apply the Title VII framework to claims under the Age Discrimination in Employment Act ("ADEA"), Mott's state law age discrimination claims are also appropriately considered under those federal precedents. *See Idris*, 2014 WL 5382633, at *3 (citing *Laber v. Harvey*, 438 F.3d 404, 430 (4th Cir. 2006) (applying the Title VII McDonnell Douglas framework to an age discrimination claim under the ADEA)). Unlike Title VII claims, however, ADEA claims must ultimately be proven, "by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision." *Bodkin v. Town of Strasburg, Va.*, 386 F. App'x 411, 413 (4th Cir. 2010) (quoting *Gross v. FBL Fin. Servs., Inc*., 557 U.S. 167, 177–78 (2009)).

1600, 2005 WL 5351448, at *6 (D. Md. Aug. 2, 2005).

### i.    No Direct Evidence

Mott first contends that he has marshalled direct evidence that age animus motivated his termination.  Under the direct method of proof, "[t]o avoid summary judgment, the plaintiff must produce direct evidence of a stated purpose to discriminate and/or [indirect] evidence of sufficient probative force to reflect a genuine issue of material fact."  *Rhoads v. FDIC*, 257 F.3d 373, 391 (4th Cir. 2001) (citation and internal quotation marks omitted).  The Fourth Circuit has explained that "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision" will satisfy plaintiff's burden of showing discriminatory animus at the summary judgment stage.  *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006) (citation omitted).  Plaintiff must demonstrate, however, that any statements reflecting discriminatory attitude be sufficiently tied to the adverse employment action.  *Id.*  When determining whether a nexus exists between the discriminatory statement and the adverse employment action, "[c]ourts have considered the context of the statement, its temporal proximity to the adverse employment action, and the status of the person making the statement."  *U.S. E.E.O.C. v. CTI Global Sols., Inc.*, 815 F. Supp. 2d 897, 906 (D. Md. 2011).

Mott argues that three sources of "discriminatory remarks" constitute direct evidence of Accenture's discriminatory animus: (1) Guillorit's testimony that Mott's "resistance to changes" was a ground for his termination; (2) Michael Cammarota's statement made to Mott that he and Mott "are both on the back nines of our career;" and (3) comments from Zacharia and Chen about Mott's "experience."  *See* ECF No. 124-1 at 24–26.  While the "Fourth Circuit has indicated that '[d]erogatory remarks may in some instances constitute direct evidence of

discrimination' . . . it has cautioned that, 'to prove discriminatory animus, the derogatory remark cannot be stray or isolated, and unless the remarks upon which plaintiff relies were related to the employment decision in question, they cannot be evidence of discrimination.'" *Hartman v. Univ. of Md. at Balt.*, No. ELH-10-2041, 2012 WL 3544730, at *17 (D. Md. Aug. 14, 2012) (quoting *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 608 (4th Cir.1999)). Further, with respect to age discrimination, "[n]ot all age-related statements . . . are categorized as direct evidence." *Davenport v. Anne Arundel Cty. Bd. of Educ.*, 998 F. Supp. 2d 428, 433 (D. Md. 2014). Instead, "courts have found only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age, to constitute direct evidence of discrimination." *Id.* (citation omitted).

Viewing the evidence in the light most favorable to Mott, these remarks, taken separately and in combination, do not constitute direct evidence of Accenture's discriminatory animus. First, with respect to Guillorit's "resistance to change" testimony. Mott plucks this phrase out of Guillorit's larger explanation for Mott's overall difficulties at Accenture—from his inability to work with two Career Counselors, his refusal to adhere to Accenture's new priorities process, and his perennial resistance to the attempts made to accommodate his dissatisfaction. ECF No. 124-3 at 102 ("The change in career counselor is just one example of his resistance to change."); *see also* ECF No. 130-1 at 3–4 (Mott emailing Zacharia that he had "intentionally" not changed his Career Counselor to Walter). Although some "[c]ourts have recognized that resistance to change is an age-related stereotype which the ADEA was created to combat," ECF No. 124-1 at 25 (citing *Williams v. Nex-Tech Wireless, LLC*, No. 15-4888-SAC-KGS, 2017 WL 1354864, at *11 (D. Kan. Apr. 13, 2017)), in this context, no evidence supports the inference that Guillorit's statements reflect some code for Mott's age rather than his difficult personality and other

communication challenges.

Next, Mott avers that Cammarota's "back nine" comment,[4] made only to Mott, is evidence of discriminatory animus, as is Cammarota's asking Mott "what are you doing here at Accenture?" ECF No. 124-1 at 25. Although the Court agrees that Cammarota's "back nine" comment was indeed a reference to Mott's age, no evidence exists that it was fueled by discriminatory animus. Moreover, Mott has generated no evidence that Cammarota had anything to do with Mott's termination. *Davenport*, 998 F. Supp. 2d at 434; *cf. Gott v. Town of Chesapeake Beach, Md.*, 44 F. Supp. 3d 610, 615–16 (D. Md. 2014) (finding direct evidence of age discrimination where an employer admitted to taking adverse action because the company was "just looking for younger people").

Last, Mott contends, in broad generalizations, that Zacharia and Chen made "pejorative comments" about Mott's "experience." ECF No. 124-1 at 26. Mott provides no specific details as to the substance of such comments to permit the plausible inference of discriminatory animus.[5] *Id.* Mott's bald allegation alone in this respect is insufficient. *See Davenport*, 998 F. Supp. 2d at 434 ("This tentativeness by courts 'militates against a finding of direct evidence of age discrimination.'") (citation omitted); *Goldberg v. B. Green & Co.*, 836 F.2d 845, 848 (4th Cir. 1988) ("[Plaintiff's] own naked opinion, without more, is not enough to establish a prima facie case of age discrimination.").

---

[4] The "back nine" is a golfing term, referencing the second half of the game, which contains eighteen holes total. *See* ECF No. 124-3 at 270.

[5] In support of his argument, Mott cites solely to his own affidavit submitted after the close of discovery and in response to Accenture's motion for summary judgment. ECF No. 124-3 at 35–51. "[A] plaintiff cannot contradict their deposition testimony and, thus, create a dispute of fact in the face of a summary judgment motion through their own self-serving affidavit." *Godbolt v. Trinity Prot. Servs., Inc.*, No. GJH-14-3546, 2017 WL 2579020, at *1 n.2 (D. Md. June 12, 2017); *see also Jones v. Puffenbarger*, No. CCB-15-3137, 2017 WL 1020819, at *15 (D. Md. Mar. 15, 2017) ("A plaintiff's self-serving affidavit is not sufficient to withstand summary judgment."). The Court is on sound footing in disregarding the affidavit in its entirety. However, even considering the affidavit, Mott's vague generalizations about his coworkers making "disparaging" comments do not create a genuine issue of material fact.

### ii. *McDonnell Douglas* Framework

Because Mott has failed to demonstrate any direct evidence of discriminatory animus, the Court next turns to whether Mott has generated sufficient evidence under the *McDonnell Douglas* framework to survive summary judgment. Mott must first establish a prima facie case of discrimination by demonstrating that (1) the plaintiff was a member of the relevant protected group;[6] (2) he suffered an adverse employment action; (3) at the time of the adverse employment action, the plaintiff was meeting his employer's legitimate expectations; and (4) the circumstances of his discharge raise a reasonable inference of unlawful discrimination. *See Young v. Giant Food Stores, LLC*, 108 F. Supp. 3d 301, 318 (D. Md. 2015). If Mott establishes a prima facie case of discrimination, the burden shifts to Accenture to offer a legitimate, non-discriminatory reason for his discharge. *See Guessous v. Fairview Property Investments, LLC*, 828 F.3d 208, 216–17 (4th Cir. 2016); *Royster v. Gahler*, 154 F. Supp. 3d 206, 232 (D. Md. 2015). If Accenture offers such a reason, the burden then shifts back to Mott to raise a genuine dispute as to whether Accenture's proffered reason is mere pretext for discrimination. *See E.E.O.C. v. Sears Roebuck & Co.*, 243 F.3d 846, 852 (4th Cir. 2001); *Evans*, 80 F.3d at 960.

Although the framework "involves a shifting back and forth of the evidentiary burden, [Mott], at all times, retains the ultimate burden of persuading the trier of fact that the employer discriminated in violation of" the law. *Venugopal v. Shire Labs.*, 334 F. Supp. 2d 835, 841 (D. Md. 2004); *see also Moore v. Mukasey*, 305 F. App'x 111, 115 (4th Cir. 2008). "The crucial issue in a Title VII action is an unlawfully discriminatory motive for a defendant's conduct, not the wisdom or folly of its business judgment." *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 383 (4th Cir. 1995); *see also Propst v. HWS Co., Inc.*, 148 F. Supp. 3d 506, 528 (W.D.N.C.

---

[6] The relevant protected group for age discrimination claims are individuals who are 40 years or older. *See Bodkin*, 386 F. App'x at 413. Mott was 61 at the time he was hired and 63 at the time of his termination.

2015) ("[I]t is not the Court's province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for" the action.) (quoting *DeJarnette*, 133 F.3d at 299) (internal alterations omitted).

The parties do not dispute that Mott is a member of at least one protected class, nor do they dispute that he suffered an adverse employment action, his discharge. The parties vigorously dispute, however, whether Mott has generated sufficient evidence that his termination was motivated by discriminatory animus. Accenture primarily contends that Mott has failed to generate sufficient evidence supporting the third prong of the *McDonnell Douglas* prima facie case—that Mott was meeting his employer's legitimate employment expectations. For similar reasons, Accenture alternatively contends that, assuming Mott establishes a prima facie case, Accenture has generated sufficient evidence, even when construed most favorably to Mott, to demonstrate he was terminated for legitimate, non-discriminatory reasons. On both arguments, the Court agrees with Accenture.

Mott has failed to generate sufficient evidence for a reasonable factfinder to conclude that was meeting his employer's legitimate employment expectations at the time of his termination. Accenture has articulated three legitimate and non-discriminatory reasons for terminating Mott's employment: (1) his poor communication skills, (2) "his resistance to changes," and (3) "unacceptable email[s] sent to his supervisor." ECF No. 123-2 at 171. Accenture has amply supported each ground. Several of the individuals who worked most closely with Mott have testified or declared under oath that Mott was not concise and had a tendency to digress from the topic at hand. *See e.g.*, ECF No. 123-2 at 7 (Chen Decl.); ECF No. 123-3 at 110 (Zaman-Malik Decl.); *id.* at 45 (Zacharia Decl.). Mott's ever increasing refrain would be to insert into the conversation his own outsized view of himself and his capabilities rather than remaining focused

on the issue at hand.  *See* ECF No. 123-4 at 88; ECF No. 123-2 at 171–72.

As to Mott's resistance to change, Guillorit and Walter testified to Mott's resistance to implement specific changes arising from the company's reorganization.  *See* ECF No. 123-4 at 66 (Walter Dep.).  By the time Guillorit made the decision to terminate Mott in late July or early August 2016, Walter had experienced months of resistance from Mott to complete simple tasks*, see, e.g.*, ECF No. 123-4 at 128 (Mott refusing to change his Career Counselor to Walter); *id.* at 134–38 (Mott rejecting the priorities previously agreed upon with Walter); *id.* at 125–26 (Walter reminding Mott to send in his Health Assessment as they had "discussed weeks ago"), and Mott's emails "were starting to be extremely aggressive."  *Id.* at 75; *see Morrall v. Gates*, 370 F. App'x 396, 398 (4th Cir. 2010) (citing plaintiff's "disrespectful and disruptive conduct" as failing to meet her employer's legitimate expectations).  Similarly, Mott's emails to his supervisor, viewed most favorably to him, convey his reluctance and, at times, outright refusal to comply with Accenture employment practices.  *See* ECF No. 123-4 at 134–38.  In short, the evidence amply supports Accenture's legitimate grounds for terminating Mott.

Mott, in response, points to his 2015 performance reviews as proof that he had been meeting Accenture's stated employment goals.  Mott misses the mark.  Although the reviews demonstrate Mott substantively was meeting Accenture's expectations, this is not the reason why Mott was terminated.  Rather, Accenture has stated, and Mott's evaluations underscore, that Mott suffered from poor communication skills.  From the beginning of his employment, he did not listen to his colleagues and could not "get to the point quickly" or express himself concisely. ECF No. 123-3 at 51.  In his annual evaluation, Mott still needed to "work on being briefer in his emails and answers to questions and be more focused on answering the questions before digressing to related topics and information."  *Id.*  Mott's evaluations therefore corroborate that

despite counseling, coaching and ample opportunity for improvement, Mott's interpersonal and communication shortcomings dominated his time at Accenture.

It also bears noting that that the reviews predate much of the developing acrimony that undergirded Accenture's legitimate grounds for terminating Mott. Walter became Mott's direct supervisor in early 2016. Thereafter, Mott refused to participate in the new priorities process. Mott also authored increasingly hostile and insubordinate emails to Walter, reflecting his simple refusal to fall under her direct supervision. Accordingly, even if a reasonable factfinder fully credits that Mott had performed well in 2015, these evaluations do not rebut his demonstrably poor performance in 2016 that provides ample basis for his termination.

Mott next contends the positive feedback from "business clients" outside his supervisory chain of command provides sufficient evidence that he was meeting Accenture's employment expectations. ECF No. 124-1 at 27. Without doubt, employees at Accenture not within Mott's supervisory chain praised Mott's legal acumen. ECF No. 124-3 at 7 (Dr. Susan Mueller's review); *id.* at 14 (Ben Berzanski's review). However, this evidence simply is not relevant in establishing whether Mott was meeting Accenture's employment expectations. *Jacobsen v. Towers Perrin Forster & Crosby, Inc.*, No. RDB-05-2983, 2008 WL 782477, at *13 (D. Md. Mar. 20, 2008) (citing *King v. Rumsfeld*, 328 F. 3d 145, 149 (4th Cir. 2003)). Nor does the fight turn on whether such positive reviewers are properly considered "coworkers," as Mott suggests. The central question is whether Mott received such positive feedback from his supervisors, not others who played no part in deciding whether to terminate him. *See Bart-Williams v. Exxon Mobil Corp.*, No. 16-1338-GBL-TCB, 2017 WL 4401463, at *10 (E.D. Va. Sept. 28, 2017) ("Further, to the extent that Plaintiff claims she received positive feedback from . . . others external to the Law Department, such feedback is irrelevant.") (citation omitted). This is

because the views most salient to Mott's discharge claim are those "of Plaintiff's supervisors, with whom [he] worked on a regular basis . . . . [T]hat controls whether [he] is satisfactorily meeting expectations." *Id.* "Whether an employee is performing at a level that meets legitimate expectations is based on the employer's perception, and [plaintiff's] own, unsubstantiated assertions to the contrary are insufficient to stave off summary judgment." *Morrall*, 370 F. App'x at 398 (citing *King*, 328 F.3d at 149). The views of those who were not in Mott's supervisory chain, therefore, do not create a genuine issue of triable fact as to whether Mott met Accenture's employment expectations.

Even if Mott could establish a prima facie case, Accenture has articulated three legitimate, non-discriminatory grounds for his discharge. Thus, the burden shifts back to Mott to demonstrate that these reasons were mere pretext for discrimination. To do so, Mott "must prove '*both* that the reason was false, *and* that discrimination was the real reason' for the challenged conduct." *Jiminez*, 57 F.3d at 378 (citation omitted).

Mott contends that "multiple and inconsistent explanations" for his termination constitute sufficient evidence of pretext. ECF No. 124-1 at 31. Generally, Mott is correct that such evidence of inconsistent rationales may constitute evidence of pretext. *See Sears Roebuck & Co.*, 243 F.3d at 852–53; *Haynes v. Waste Connections, Inc.*, No. 17-2431, slip op. at 12 (4th Cir. Apr. 23, 2019) (finding sufficient evidence of pretext where employer asserted "for the first time during this litigation an entirely different reason for the termination than was offered initially"). Accenture, however, remained steadfast in its reasons for terminating Mott. From Mott's initial evaluation, Accenture documented Mott's shortcomings in communication and his resistance to Accenture's corporate structure. Indeed, Mott's own contemporaneous notes from his conversation with Accenture's investigator, Toni Corban, at the inception of his discrimination

claims, support, rather than undermine, the consistency with which Accenture has stated its grounds for firing Mott. *See* ECF No. 124-3 at 226.

Moreover, "in cases where the hirer and the firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer." *Proud v. Stone*, 945 F.2d 796, 797 (4th Cir. 1991). This "same actor inference" recognizes that "[i]t hardly makes sense to hire workers from a group one dislikes . . . only to fire them once they are on the job." *Id.*; *see also Qiydaar v. People Encouraging People, Inc.*, No. ELH-17-1622, 2018 WL 3458310, at *10 (D. Md. July 17, 2018). The facts here give rise to such an inference, as Guillorit made the "final decision" to hire Mott (ECF No. 123-2 at 182, 220) and to terminate him less than two years later. *Id.* at 175.

Because Mott has failed to generate sufficient evidence from which a reasonable factfinder could conclude Mott had met Accenture's reasonable employment expectations, summary judgment is warranted. Alternatively, viewing the evidence most favorably to Mott, he cannot demonstrate that Accenture's stated reasons for his termination were pretextual. Accenture is entitled to summary judgment with respect to Mott's discriminatory discharge claims.

### C. Discriminatory Failure to Promote

Mott's failure to promote claim is governed by the same burden-shifting framework as his discharge claims. *See Moore*, 305 F. App'x at 115. To survive challenge, Mott must demonstrate that (1) he is a member of a protected group; (2) he applied for the position in question; (3) he was qualified for the position; and (4) Accenture rejected his application under circumstances giving rise to an inference of unlawful discrimination. *Id.* Mott alleges that the

promotion of three female candidates for the Team Lead and litigation attorney positions to which Mott applied "creates an inference of gender and age bias." ECF No. 124-1 at 36.

Again, the parties mainly focus on whether Mott could demonstrate Accenture's proffered promotion decisions were pretextual. "A plaintiff alleging a failure to promote can prove pretext by showing that [he] was better qualified, or by amassing circumstantial evidence that otherwise undermines the credibility of the employer's stated reasons." *Coleman v. Schneider Elec. USA, Inc.*, 755 F. App'x 247, 249 (4th Cir. 2019) (quoting *Heiko v. Colombo Sav. Bank, F.S.B.*, 434 F.3d 249, 259 (4th Cir. 2006)). "We assess relative job qualifications based on the criteria that the employer has established as relevant to the position in question." *Id.* A plaintiff "cannot establish pretext by relying on criteria of her choosing when the employer based its decision on other grounds." *Id.* (citation omitted); *see also Hux v. City of Newport News, Va.*, 451 F.3d 311, 315 (4th Cir. 2006) ("[A] plaintiff . . . cannot simply compare herself to other employees on the basis of a single evaluative factor artificially severed from the employer's focus on multiple factors in combination.").

To be sure, Mott contends that, in his view, he possessed "clearly superior" credentials as compared to Walter for the Team Lead position. ECF No. 124-1 at 36. He further maintains that his comparatively "extensive litigation experience" required by the Litigation Attorney positions, again render him a shoe-in for the job. *Id.* at 37. That said, "[a] plaintiff's own opinions about [his] qualifications and [his] employer's subjective motivations are not sufficient to establish pretext." *Whitehurst v. Sebelius*, No. WDQ-11-3092, 2012 WL 3116142, at *7 (D. Md. July 26, 2012) (internal citations and marks omitted); *see also Evans*, 80 F.3d at 960–61 ("It is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff.") (internal citations and marks omitted).

With regard to the Team Lead position, Accenture established three subject matter criteria necessary for the position—health care regulation, resources, and public service. ECF No. 123-3 at 153. Accenture's stated reason for selecting Walter over Mott turned on her superior experience in two of the three categories. *Id.* Although Mott possessed more experience in the health regulatory field, Walter bested him with regard to the other two areas. *Id.* Accenture highlights, and Mott generates no evidence to the contrary, that Mott fared poorly during the job interview in that he focused disproportionately on why he did not want his current position rather than the attributes making him a superior candidate for the new position. ECF No. 123-4 at 34. Moreover, consistent with previous critiques of Mott's communication skills, Guillorit noted that Mott had a "[h]ard time . . . listen[ing] and responding to questions" during the interview." *Id.* at 34, 35; *see Coleman*, 755 F. App'x at 249 (crediting hiring manager's reasoning that plaintiff's "communication skills needed improvement").

As to the two litigation attorney positions, Accenture's stated preferred criteria included experience as "a partner in [a] law firm." *See* ECF No. 123-4 at 7 (Oct. 2015 posting); ECF No. 123-3 at 143 (Apr. 2016 posting). Mott had not worked at a law firm for nearly 20 years (ECF No. 124-3 at 68), while the selected candidates were currently practicing at firms. *See* ECF No. 123-3 at 155–56, 163–64. The attorneys selected, therefore, met Accenture's stated criteria. By contrast, Mott has generated no evidence to establish that—out of the hundreds of applicants who applied for each position—his skills and experience were so vastly superior in the eyes of the employer that the failure to choose Mott gives rise to an inference of discrimination. Accordingly, summary judgment must be granted in Accenture's favor on the failure to promote claims.

### D. Hostile Work Environment

Mott's hostile work environment claims suffer the same fate, but for different reasons. To prove a hostile work environment claim, a plaintiff must show that the complained-of conduct was (1) unwelcome; (2) based on a protected characteristic; (3) sufficiently severe or pervasive to alter the conditions of employment and to create an abusive work environment; and (4) imputable to his employer. *See Pryor v. United Air Lines, Inc.*, 791 F.3d 488, 495–96 (4th Cir. 2015). Mott cannot prevail on this claim because he has failed to generate sufficient evidence of a hostile work environment. Alternatively, Mott has failed to marshal evidence that the claimed acts of hostility were motivated by discriminatory animus.

Mott points primarily to Zacharia, Chen, and Zaman-Malik's treatment of Mott to support this claim. *See* ECF No. 35 ¶¶ 19, 21; ECF No. 123-2 at 61, 83 (Mott Dep.). Mott specifically avers that he was subjected to a hostile environment because: (1) Zacharia used vulgarity during a single phone call when he said "there were a lot of smart F-ing people at Accenture" (ECF No. 123-2 at 56); (2) Chen made unspecified "denigrating comments" (*id.* at 57), to include criticizing publicly Mott's legal advice "to other colleagues;" and (3) Malik-Zaman excluded Mott from certain calls. *Id.* at 61.

Taking all claimed hostile acts as true and most favorably to Mott, no reasonable factfinder could conclude that Mott was forced to work in a hostile environment. *See Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015). In determining whether conduct is "sufficiently severe or pervasive," courts look to the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 299 (citation omitted). This prong is met "[w]hen the workplace is permeated with

discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." *Id.* (citation omitted). In contrast, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008) (citation omitted).

In the course of his nearly eighteen-month employment, Mott has identified a handful of uncomfortable moments in support of this claim. They include a rogue dropping of the F-bomb, vague criticisms, and exclusion from certain calls. *Cf. Rodriguez v. Kantor*, 162 F.3d 1155, *7 (4th Cir. 1998) (unpublished table decision) (supervisor's "constant criticism, conflicting instructions and frequent shouting and screaming" was not "severe and pervasive" conduct). Courts consistently have determined that workplace behavior far more disquieting than that which Mott experienced is not sufficiently severe and pervasive to constitute a hostile work environment. *See, e.g.*, *Vincent v. MedStar S. Md. Hosp. Ctr.*, No. TDC-16-1438, 2017 WL 3668756, at *9 (D. Md. Aug. 22, 2017) (supervisor constantly yelling at plaintiff on the phone, including calling plaintiff "stupid"); *Young*, 108 F. Supp. 3d at 312 (supervisor "yelled at [plaintiff]" and "ignored her telephone calls and messages"); *Khoury v. Meserve*, 268 F. Supp. 2d 600, 614 (D. Md. 2003), *aff'd*, 85 F. App'x 960 (4th Cir. 2004) (describing one encounter where a supervisor "yelled at Plaintiff, told her she was incompetent, pushed her down in her chair, and blocked the door to prevent Plaintiff from leaving while he continued to yell at her"). Taken together or individually, no reasonable factfinder could conclude that the incidents in this case altered the conditions of Mott's employment and created an abusive work environment.

Alternatively, even if these incidents could rise to the level of a sufficiently severe and

pervasively hostile work environment, Mott has generated no evidence that such hostile acts were born of discriminatory motive. *See King v. E. Shore Water, LLC*, No. SKG-11-1482, 2012 WL 3155647, at *12 (D. Md. July 31, 2012) (finding certain "harsh, offensive, and insulting" comments, including a supervisor saying "this is my business and you're going to do what the f*** I tell you to do or there's the f****** door," were not discriminatory). None of the above-described incidents concerned Mott's age, gender or national origin. To the extent Zacharia, Chen and Zamin-Malik engaged in abrasive and rude behavior, they were equal opportunity boors. Mottet, a French male over twenty years younger than Mott, for example, told Mott that he too had similar encounters with Zacharia and Chen. *See* ECF No. 124-3 at 157. And Amanda Brino (a 40-year-old American female) testified that Zaman-Malik experienced "abrasive interactions" with many colleagues at Accenture. ECF No. 123-3 at 103–04 (describing as "the Fauzia treatment"); *see also Vincent*, 2017 WL 3668756, at *9 (supervisor "refusing to communicate with [plaintiff]" and "not inviting her to meetings" was not discriminatory). Absent any evidence that such hostilities were directed at Mott on account of his protected status, the claim must fail. Accenture is entitled to summary judgment in its favor with respect to Mott's hostile work environment claims.

### E. Retaliation

Mott contends that he was terminated in retaliation for expressing his intention to seek legal remedy for Accenture's discrimination. Mott particularly relies on his June 30, 2016 conversation with Phelan during which he "discussed extensively" the subject of discrimination. ECF No. 123-2 at 105. Again, Mott has failed to generate sufficient evidence to demonstrate a causal link between the protected activity and his termination for this claim to survive challenge.

To make out a prima facie case of retaliation, Mott must demonstrate that: (1) he engaged

in protected activity; (2) Accenture took an adverse action against him; and (3) a causal link exists between the two. *Strothers v. City of Laurel, Md.*, 895 F.3d 317, 327 (4th Cir. 2018). Although generally "temporal proximity is sufficient to establish a causal connection at the prima facie stage," *id.* at 336–37, where the employer takes steps to pursue legitimate grounds for termination before the alleged protected activity took place, temporal proximity of the two events alone is insufficient to proceed to the jury. *See Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) (per curiam) ("[P]roceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality."); *Horne v. Reznick Fedder & Silverman*, 154 F. App'x. 361, 364 (4th Cir. 2005) (per curiam).

The Court credits that Mott's conversation with Phelan constitutes protected activity. ECF No. 123-2 at 105. However, when construing the evidence most favorably to Mott, the Court cannot conclude that any evidence supports a causal connection between this conversation and his termination. Well before Mott talked with Phelan on June 30, Walter had been sharing with Phelan in Human Resources Mott's significant performance deficiencies and requesting guidance. *See* ECF No. 123-2 at 207; ECF No. 123-4 at 141. When Mott showed no signs of improvement, Guillorit asked Phelan to provide severance accruals for Mott, in anticipation of terminating him. ECF No. 123-4 at 233. Accenture, therefore, has presented evidence giving rise to the inference that Mott's termination was due to his ongoing, substandard performance.

By contrast, Mott has not generated any evidence establishing a causal link between his call with Phelan and his eventual termination over two months later. No evidence exists that Phelan communicated her June 30 conversation with him regarding his allegations of discrimination to anyone, let alone Guillorit. ECF No. 123-4 at 158–59 (Phelan Dep.); *id.* at 170 (Phelan's handwritten notes summarizing her June 30 call). Guillorit instead maintains that Mott

for the first time communicated his intention to file a discrimination claim immediately after she terminated him.  ECF No. 123-2 at 219.  Accordingly, no evidence exists that Mott's June 30 discussions about "discrimination" factored at all into the decision to fire him.  Summary judgment must be granted in Accenture's favor as to this claim.

### F.  Unpaid Bonus

Mott's remaining count is brought under Maryland's Wage Payment and Collection Law ("MWPCL").  Md. Code Ann., Lab. & Empl., § 3-507.2.  In his Amended Complaint, Mott avers that he is entitled to a bonus for the fiscal year ending August 31, 2016, prior to Mott's termination.  ECF No. 35 ¶ 79.  Mott cross-moves for partial summary judgment as to this count only.  ECF No. 124-1 at 37.

When faced with cross-motions for summary judgment, the court must consider "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (citations and internal quotation marks omitted).  The court must deny both motions if it finds a genuine issue of material fact precludes resolution, "[b]ut if there is no genuine dispute and one or the other party is entitled to prevail as a matter of law, the court will render judgment." Charles Alan Wright & Arthur R. Miller, 10A Fed. Prac. & Proc. Civ. § 2720 (4th ed. 2019).

Accenture contends that the Court must determine, as a threshold matter, whether the bonus at issue constitutes "wages" under the MWPCL.  The statute defines "wage" to include: "(i) a bonus; (ii) a commission; (iii) a fringe benefit; (iv) overtime wages; or (v) any other remuneration promised for service."  Md. Code Ann., Lab. & Empl., § 3-501(c)(2).  However, under Maryland law, "not all bonuses constitute wages."  *Medex v. McCabe*, 372 Md. 28, 36 (2002) (citing *Whiting–Turner v. Fitzpatrick*, 366 Md. 295 (2001)).  Rather, "it is the exchange

of remuneration for the employee's work that is crucial to the determination that compensation constitutes a wage." *Id.* The Maryland Court of Special Appeals has further clarified "that payments, which are merely offered as a gratuity, revocable at any time before delivery, and not promised for service, do not qualify as wages under the Wage Law." *Blanch v. Chubb & Sons, Inc.*, 124 F. Supp. 3d 622, 636 (D. Md. 2015) (quoting *Aronson & Co. v. Fetridge*, 181 Md. App. 650, 671 (Md. Ct. Spec. App. 2008)). Accordingly, "the critical question is whether an employee is *entitled* to a non-discretionary bonus at the time of his termination based on a contractual obligation or binding promise undertaken by his employer." *Willis v. Stanley Black & Decker, Inc.*, No. DKC 12-1991, 2012 WL 6019364, at *5 (D. Md. Nov. 30, 2012).

Here, the express terms of Accenture's two variable pay plans reveal Mott's bonuses are discretionary. Both the Global Annual Bonus and the Individual Performance Bonus, for which Mott may have been otherwise been eligible, state that:

> Accenture reserves the right to amend, change, suspend, or terminate any or all of the bonus or variable pay plans at any time without any obligation to replace it. *All variable pay payouts are subject to the discretion of Accenture.* A payout amount in one year does not entitle an employee to an equivalent payout in future years.

ECF No. 124-3 at 296, 300 (emphasis added).[7]

Such discretionary bonuses do not fall within the scope of the MWPCL. "A bonus that is awarded at the discretion of the employer is 'merely a gift, a gratuity, revocable at any time before delivery' and is not covered by the MWPCL." *Willis*, 2012 WL 6019364, at *4; *see also Varghese v. Honeywell Int'l, Inc.*, 424 F.3d 411, 420 (4th Cir. 2005) (former employee's stock options were not "wages" payable under the MWPCL where the employer "always retained the

---

[7] Mott asserts that the bonuses were "promised for service" (ECF No. 124-1 at 38) but only cites to the terms of the pay plans, which reveal that payouts under the plans remained at Accenture's discretion. Further, Mott's offer letter simply lists "Variable Pay Plan: GAB, IPB" under the "terms of . . . employment," without any suggestion that the bonuses would be non-discretionary. ECF No. 18-2 at 2.

discretion" not to award them); *Mazer v. Safeway, Inc.*, 398 F. Supp. 2d 412, 426 (D. Md. 2005) (bonus was not "wages" because it was not "promised" given that the former employee "did not know whether he would ever receive a bonus").

Mott argues that he is entitled to a 2016 bonus based on the terms of Accenture's Employee Separations policy. *See* ECF No. 124-3 at 260–62. Mott cites to the policy's provision which states that termination "for cause" renders the employee ineligible to receive a bonus. *See id.* at 262. Mott conflates criteria for bonus eligibility with whether conferring the bonus is discretionary. Regardless of whether Mott was terminated "for cause," the unrebutted evidence demonstrates that if an employee *is* eligible to receive a bonus, the actual award of the bonus remains within "the discretion of Accenture." ECF No. 124-3 at 296, 300. As a matter of law, the Accenture bonuses are not "wages" with respect to the MWPCL. Accenture's motion for summary judgment as to Count VII is granted and Mott's cross-motion for partial summary judgment is denied.

## IV. Motions Regarding the Sanctions Order

The Court lastly turns to two outstanding motions concerning this Court's August 28, 2018 Order of sanctions against Mott. Overall, the discovery process in this case was tortured, largely because of Mott. After several warnings to Mott that further failure to engage in good faith would trigger discover sanctions (*See* ECF Nos. 98, 105), Mott sought an order requiring Accenture to produce certain electronic records which, in Mott's misguided view, "were clumsily altered." ECF No. 108 at 2. Mott then withdrew his request for the Court's assistance because, according to him, the parties were "attempting to negotiate a path forward." ECF No. 109 at 1. Accenture responded, underscoring that Mott had failed to meet and confer with Accenture prior to filing his initial letter. ECF No. 110 at 1; *see also* ECF No. 45 at 4 ("Any

motion to compel shall be filed only after counsel have conferred.").  Had Mott engaged in a good faith meet and confer prior to involving the Court—again—in discovery matters, Mott would have learned that Accenture had produced load files with metadata which largely, if not totally, obviated Mott's concerns.[8]  *Id.*

The Court, therefore, found that Mott had, once again, wasted judicial resources as well as those of Accenture, in filing a motion for Court intervention on a discovery matter easily resolved by a good faith meet and confer.  Consequently, the Court ordered Mott to pay "Accenture's attorneys' fees and costs associated with" the listed discovery violations.  ECF No. 114 at 2.  The Court further directed Accenture to detail by separate submission the amount claimed for the foregoing matters.

Accenture filed its Request for Attorney's Fees and Costs on September 7.  ECF No. 115. Mott followed with a Motion for Reconsideration of the Court's sanctions Order.  ECF No. 116.

### A.  Plaintiff's Motion for Reconsideration

Courts may reconsider interlocutory orders "at any time prior to the entry of a final judgment."  *Fayetteville Inv'rs v. Commercial Builders, Inc.*, 936 F.2d 1462, 1469 (4th Cir. 1991); *see also* Loc. R. 105.10 ("[A]ny motion to reconsider any order issued by the Court shall be filed with the Clerk not later than fourteen (14) days after entry of the order.).  Courts will reconsider interlocutory decisions based on: (1) a change in controlling law; (2) additional evidence that was not previously available; or (3) a showing that that the prior decision was clearly erroneous or manifestly unjust.  *See Boyd v. Coventry Health Care Inc.*, 828 F. Supp. 2d 809, 814 (D. Md. 2011); *Potter v. Potter*, 199 F.R.D. 550, 552 (D. Md. 2001) (discussing a

---

[8] While the "static image or TIFF" of the Skype invitations did not provide Mott with a full picture of the relevant information, Accenture also produced the corresponding load files containing metadata which "normalizes the evidence."  ECF No. 120-1 at 18.  Accenture also noted that Mott had propounded 77 requests for admissions, far in excess of the limits provided under the Rules.

motion to reconsider a discovery sanctions order).

Federal courts are obligated to reach the correct judgment under law, "[t]hough that obligation may be tempered at times by concerns of finality and judicial economy." *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 515 (4th Cir. 2003). Where a party "merely requests the district court to reconsider a legal issue or to 'change its mind,' relief is not authorized.'" *Pritchard v. Wal-Mart Stores, Inc.*, 3 F. App'x 52, 53 (4th Cir. 2001) (citation omitted).

Plaintiff has not presented the Court with any new facts not otherwise discoverable at the time the Court imposed sanctions. Nor does Mott argue that reconsideration is necessary due to an intervening change in controlling law or to prevent manifest injustice. Rather, Mott persists in forwarding tortured interpretations of this Court's discovery order governing filing letter pleadings in lieu of formal motions to compel. *See* ECF No. 46. Mott contends this order somehow negates the parties' obligations to meet and confer prior to filing the letter pleading about their discovery disputes. This argument is nonsensical. It is basic that parties are to conduct a good faith meet and confer *in advance* of seeking Court involvement. *See* Fed. R. Civ. P. 37(a)(1). Nothing in the Court's discovery order directly or indirectly states otherwise. Rather, the Order requires parties to file an informal letter in advance of filing a formal motion to compel setting out the grounds upon which the party will file the formal motion. In that respect, the discovery order provides an expedient, but equally just, avenue to resolve discovery disputes. Nowhere does the Order absolve the parties of conducting a good faith meet and confer prior to involving the Court, and so ordering would flatly contravene this Court's own Local Rules. *See* Loc. R., App'x A.1.f ("*Whenever possible,* attorneys are expected to communicate with each other in good faith throughout the discovery process to resolve disputes without the need for intervention by the Court, and should do so promptly after becoming aware of the grounds for

the dispute. In the event that such good faith efforts are unsuccessful, an unresolved dispute should be brought to the Court's attention promptly *after* efforts to resolve it have been unsuccessful.") (emphasis added). Mott's argument to the contrary lends further support for the propriety of sanctions for abusing the discovery process. Plaintiff's motion for reconsideration is denied.

## B. Defendant's Request for Attorneys' Fees

Finally, pending before the Court is Defendant's request for attorney's fees and costs in response to the Court's sanctions Order. *See* ECF No. 115. The Court specifically ordered Mott to pay "Accenture's attorneys' fees and costs associated with (1) responding to and addressing the concerns in Mott's August 9, 2018, letter; (2) addressing Mott's inappropriately propounded Requests for Admission; and (3) preparing and filing Accenture's August 10, 2018, letter with the Court." ECF No. 114 at 2.

Accenture seeks reimbursement for 23.95 attorney hours expended for a total proposed recovery of $10,097.75 in fees and $462.83 in costs. *See* ECF No. 115-1 at 5–6. The Court has reviewed the supporting attorney timesheets and finds certain work is beyond the scope of the imposed sanction order. For example, as Accenture has conceded, the August 24, 2018 entry for $340.00 from Carol Abing does not fall within the Court's Order. ECF No. 121 ¶ 5. Similarly, Mary Lenahan's August 13, 2018 entry of $199.60 for client consultation is also not clearly related to the three tasks outlined above. *See* ECF No. 115-1 at 3 (billing entries). Mott also urges the Court to disallow Accenture's "block-billed" entries, "i.e., a list of multiple tasks performed within a single time entry that does not identify the portion of work performed on each included task." ECF No. 118 at 9 (citing *Miller v. U.S. Foodservice, Inc.*, No. CCB-04-1129, 2006 WL 2547212, at *1 (D. Md. Aug. 30, 2006)). However, unlike the entries in *Miller*,

the block-billed entries here largely include tasks that all fall within the scope of the Court's

Order. *See Miller,* 2006 WL 2547212, at *1. The Court notes one exception, Lenahan's August

24, 2018 entry for $1,896.20 which included time for drafting responses to Mott's Request for

Admissions. ECF No. 115-1 at 4. Accordingly, the Court reduces the compensable time for that

entry by half to 1.9 hours.

Plaintiff also objects to the hourly rates suggested by Accenture, as Defendant's request

for attorneys' fees "presented no proof to justify an hourly rate." ECF No. 118 at 10. "The fee

applicant bears the burden of establishing the reasonableness of a requested hourly rate."

*Astornet Techs., Inc. v. BAE Sys.*, Inc., 201 F. Supp. 3d 721, 730 (D. Md. 2016) (citing *Plyler v.

Evatt*, 902 F.2d 273, 277 (4th Cir. 1990)). In the District of Maryland, evidence of the prevailing

market rate is "embedded" in the Guidelines set out in this Court's Local Rules. *Manning v.

Mercatanti*, No. ELH-11-2964, 2014 WL 1418322, at *5 (D. Md. Apr. 10, 2014) (citation

omitted); *see also* Loc. R., App'x B. All three of Accenture's requested hourly rates exceed the

presumptively reasonable rate: (1) Abing's rate is $170, whereas the Guidelines range is $95–

$150 for paralegals; (2) Lenahan's rate is $499, whereas the Guidelines range is $165–300; and

(3) Roche's rate is $679, whereas the Guidelines range is $300–475. *See* ECF No. 115-1 at 3–6;

Loc. R., App'x B.3. Although the Guidelines are not binding, Accenture has not provided

sufficient grounds for this Court to depart so substantially from the presumptively reasonable

rates. *See Manning*, 2014 WL 1418322, at *5. The Court will accordingly reduce the hourly

rates to correspond to the highest level of the applicable guidelines range.

Based on the foregoing, the total amount awarded to Accenture will be:

| Name | Hours | Billing Rate | Total |
|---|---|---|---|
| Abing, Carol | 4.7 | $150 | $705 |
| Lenahan, Mary | 13 | $300 | $3,900 |
| Roche, Michael | 1.95 | $475 | $926.25 |
| | | **Total Attorneys' Fees** | $5,531.25 |
| | | **Total Costs** | $462.83 |
| | | **Grand Total** | **$5,994.08** |

## V.     Conclusion

For the foregoing reasons, Plaintiff's Motion to Strike (ECF No. 125) is GRANTED in part and DENIED in part; Plaintiff's Cross-Motion for Partial Summary Judgment (ECF No. 124) and Motion for Reconsideration (ECF No. 116) are DENIED; and Defendant's Motion for Summary Judgment (ECF No. 123) is GRANTED.  The Court awards Defendant $5,994.08 in attorneys' fees and costs against Plaintiff.  A separate Order follows.


  4/29/2019
Date

                                                          /S/
                                              Paula Xinis
                                              United States District Judge